**TEXAS FACULTY ASSOCIATION,
et al., Plaintiffs–Appellants,**

v.

**UNIVERSITY OF TEXAS AT DALLAS,
A Public Body of Corporate Board Re-
gents of the University of Texas Sys-
tem, Robert H. Rutford, President of
the University of Texas at Dallas, in
His Official and Individual Capacity, et
al., Defendants–Appellees.**

No. 90–1672.

United States Court of Appeals,
Fifth Circuit.

Oct. 23, 1991.

ics. The events leading to the termination of each program will be separately considered.

Daniel A. Ortiz, Arlington, Tex., Patricia Polach, Robert H. Chanin, Jeremiah A. Collins, Bredhoff & Kaiser, Washington, D.C., for plaintiff-appellant.

Lou Bright, James C. Thompson, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Gen. Litigation Div., Austin, Tex., for defendants-appellees.

Before KING and JONES, Circuit Judges.*

KING, Circuit Judge:

The issue in this case of first impression is the scope of procedural due process guaranteed by the Fourteenth Amendment to faculty members at a public university who are terminated incident to a university president's decision wholly to eliminate the academic programs in which they teach. We hold that the summary judgment evidence establishes that the affected faculty members were given notice and a meaningful opportunity to be heard on the university president's decision to eliminate the academic programs, but not on his decision to terminate each faculty member's employment. We therefore affirm in part and reverse in part.

I.

The appellants were tenured faculty in two separate academic programs at the University of Texas at Dallas (UTD). Two, Professors Edwin Hammer and Kim Reid, taught in the Special Education program of UTD's School of Human Development. The other eight, Professors Joe Moore, John Warwick, Jerry Crowder, Guy Lanza, Aharon Netzer, Martin Katzman, William Waller, and William Cale, taught in the Environmental Sciences program of UTD's School of Natural Sciences and Mathemat-

## A. *The Special Education Program*

In the wake of the sweeping Education Reform Bill passed by the Texas Legislature in 1984, and as part of an effort to "define a general mission for each public college and university in the State," two separate committees—the Teacher Education Review Committee (TERC), appointed by UTD's Vice President for Academic Affairs, Dr. Alexander Clark, and the Ad Hoc Committee, appointed by Dean Thomas Tighe of the School of Human Development—were established to conduct a comprehensive review of UTD's teacher education and certification programs. In March 1985, the Ad Hoc Committee recommended to Dean Tighe that all Special Education programs, except those recently discontinued by the State of Texas, be continued. One month later, TERC made the opposite recommendation to Vice President Clark:

> Abolish the Program in Special Education if no substantive and conclusive evidence is provided that a significant reversal will occur in the declining enrollment patterns, and the programs can immediately become financially self-sustaining. This abolition would eliminate the degrees of [Bachelor of Science and Master of Science.] It would also eliminate the faculty positions not required to sustain the doctoral program in Human Development and Communication Science.

Dean Tighe and Professor George Fair, Director of the Special Education program, objected to the data relied upon and the recommendation advanced by TERC in separate memoranda to Vice President Clark.

After receiving these comments, Vice President Clark appointed yet another committee, the Council on Teacher Education Subcommittee, to study the issue. Its report, issued in February 1987, recommended that all undergraduate teacher education programs be eliminated, and

---

* Judge Alvin B. Rubin was a member of the original panel but died on June 11, 1991 before this decision was rendered. This matter is being decided by a quorum. 28 U.S.C. § 46(d).

ranked in order of priority the twenty-two graduate programs in teacher certification that it thought should be maintained. Programs in Special Education ranked eight, ten, eleven, twenty-one, and twenty-two. Dean Tighe, writing on behalf of the School of Human Development, agreed with a number of the CTE Subcommittee's recommendations, but took "strong exception" to the low priority given several of the Special Education programs.

Vice President Clark circulated the CTE Subcommittee report to the appropriate deans, who were charged with consulting with "appropriate members of their respective faculties," and then met individually with the deans involved with teacher education programs. In June 1987, Vice President Clark recommended to UTD's President, Robert H. Rutford, that UTD "eliminate its undergradu[a]te and graduate degree programs in Special Education, effective August 31, 1989." President Rutford agreed. On July 15, 1987, President Rutford wrote to the affected faculty members, informing them that, due to "declining enrollments and insufficient research support," the Special Education programs were to be phased out and that their positions would be terminated as of May 31, 1989.

### B. The Environmental Sciences Program

In August 1986, Dean David Dunn of UTD's School of Natural Sciences and Mathematics (NS & M) recommended sua sponte to Vice President Clark that UTD eliminate NS & M's Environmental Sciences program. Dean Dunn stated that both enrollment and research grants had declined dramatically over the past decade, and that there was little prospect for improvement. Because this was so, the program was a "serious financial drain" on NS & M, and the impending transfer of the lucrative Computer Science program to UTD's Engineering School would exacerbate the problem. Because Environmental Sciences was, in Dean Dunn's words, "less central to the mission of NS & M than any other program," its continuation could be "justified only so long as it does not deny

other programs the opportunity to achieve regional preeminence and national prominence.... In effect, the program is a worthwhile experiment that failed."

Vice President Clark agreed with Dean Dunn, and transmitted his recommendation to President Rutford. President Rutford concurred and drafted a letter to the Environmental Sciences faculty, but he was denied approval by the University of Texas system to eliminate the program because doing so might violate the terms of a gift to UTD.

In early 1987, Dean Dunn met with the Environmental Sciences faculty to discuss the program's deteriorating condition, but he did not announce that the program was in imminent danger of elimination. Dr. William Cale, head of the Environmental Sciences program, responded to Dean Dunn's concerns by memorandum, indicating that the decline in student enrollment had ceased, but Dr. Cale's analysis was invalid because it assumed that graduate students would be required to enroll for fifteen semester hours per term, rather than the customary twelve.

In July, Dean Dunn renewed his recommendation that the program be eliminated, and suggested that a research institute in environmental sciences be created to satisfy the terms of the gift. Again, President Rutford agreed, and he informed the Board of Regents that he wanted to phase out the program. This time his request was approved.

On September 19, 1987, Professor Cale telephoned President Rutford and asked that a study committee be appointed to review the Environmental Sciences program before the decision to eliminate it was final. President Rutford informed him that "there had been as much review of the decision as was necessary," unless "new information that was relevant to [the] decision" was brought forth. Two days later, President Rutford notified the Environmental Sciences faculty that the program was to be phased out and their positions terminated as of May 31, 1989.

On September 23, Dean Dunn met with the NS & M faculty to answer questions about the phase-out. On September 30, Professor Cale, on behalf of the Environmental Sciences faculty, wrote a letter to President Rutford raising a number of questions about how the phase-out would be implemented. President Rutford responded by letter one week later, answering Dr. Cale's questions and stating that "[i]f other questions arise I will be happy to address them."

On July 6, 1988, the Natural Sciences faculty sent a letter to President Rutford protesting UTD's failure to afford them pretermination hearings before unbiased members of the faculty, as provided for in section 6(12) of the Board of Regents' *Rules and Regulations.* President Rutford responded on August 1, saying that section 6(12) was inapplicable because the Environmental Sciences program was not being eliminated for reasons of financial exigency, concluding that "[i]f you have anything to present other than your contentions regarding procedural matters related to the decision, please contact Dean Dunn, Dr. Clark, or myself." The Environmental Sciences faculty responded in a one paragraph letter on August 5, making clear that they were in "complete and total disagreement" with the merits of the decision to eliminate the program.

On September 21, 1988, counsel for the appellants wrote to President Rutford demanding that appellants receive a full adversary hearing. The General Counsel for the University of Texas denied the appellants' demand by letter dated October 6, but stated that President Rutford, Vice President Clark, and Dean Dunn were available "to meet with any or all of the affected faculty members on an informal basis to discuss the facts that were considered in reaching this decision and allow them to demonstrate that those facts were in error." None of the appellants sought such a meeting.

By consent of the parties, this matter was transferred to a Magistrate for all proceedings below, including the entry of final judgment. The Magistrate granted summary judgment against appellants on their procedural due process claim, holding that (1) appellants had no right to be heard on the decision to phase out the academic programs; (2) the October 6 letter from the university's General Counsel offered all the process due appellants under the Fourteenth Amendment regarding the decision to terminate appellants' employment; and (3) because appellants were offered a meaningful opportunity to be heard, their failure to pursue that opportunity waived any right to complain that they were deprived of procedural due process. The Magistrate further held that the individual defendants sued in their individual capacities were entitled to qualified immunity.

## II.

Appellants argue that they were denied procedural due process with respect to two distinct acts by President Rutford that deprived them of constitutionally protected property interests in their jobs: first, his decisions to eliminate the academic programs in which they were employed, and second, his decisions to terminate their employment. The Magistrate concluded that the program-elimination decisions were essentially "non-adjudicatory," and that appellants were therefore not entitled a due process hearing with respect to those decisions. He further held that appellants had received due process with respect to the employment-termination decisions.

■ The Fourteenth Amendment guarantees that "No state shall ... deprive any person of life, liberty, or property, without due process of law." Though the nature of the process due varies according to the governmental and private interests involved, whenever the four elements necessary to trigger that guarantee occur—that is, whenever (1) a state actor (2) deprives (3) a person (4) of a protected interest—*some* sort of procedural protection must be provided. In its pleadings and in its brief, UTD either explicitly or implicitly concedes *each* of these elements with respect to *both* of President Rutford's decisions. We therefore need not address whether the decision to eliminate the programs, as dis-

tinct from the decision to terminate appellants' employment, worked a "deprivation" of appellants' property interests. The question before us is solely whether the procedural protections employed by UTD with respect to each of President Rutford's decisions adequately guarded those interests.

■ "[D]ue process is flexible and calls for such procedural protections as the particular situation demands."[1] The Supreme Court held in *Mathews v. Eldridge*[2] that the process due in a given situation is determined by weighing three factors:

> First, the private interest that will be affected by the official actions; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[3]

We will address each of the *Mathews* factors in turn. Because many of the same considerations are relevant both to the program-elimination and employee-termination decisions, we will discuss them together.

A. *The Private Interest*

"[T]he significance of the private interest in retaining employment cannot be gainsaid."[4] Neither the Supreme Court nor this court has sanctioned the termination of a tenured public employee without some sort of pre- or postdeprivation hearing, even in cases in which the employee's termination was, as in this case, "precipitated

by factual circumstances unrelated to alleged performance, conduct, status or omission."[5]

In *Russell v. Harrison*,[6] for example, a number of tenured instructors and administrators were dismissed due to no fault of their own, but solely because of the dire financial woes afflicting two Mississippi universities. This court held that the due process clause required that they be afforded "(1) written notice of the reasons for termination and (2) an effective opportunity to rebut those reasons," including "the right to respond in writing ... and to respond orally before the official charged with the responsibility of making the termination decision."[7] Even though the universities had employed objective criteria to determine whom to dismiss, we noted that "an employee would at least be entitled to utilize the hearing to complain that *even under the plan* used by defendants, he or she personally should not have been dismissed."[8] The Ninth Circuit[9] and district courts in at least two other circuits[10] have reached similar conclusions. The appellants' private interest in President Rutford's decision to terminate their employment is therefore apparent.

In the rather unique context of this case, the appellants' private interests in President Rutford's decisions to eliminate the two programs were no less weighty. In most cases in which tenured faculty have been terminated for reasons unrelated to their performance or conduct, the event precipitating the need to terminate *some* faculty members and the decision to terminate *particular* faculty members are unrelated. In *Johnson v. Board of Regents*,

1. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

2. 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

3. *Id.,* at 335, 96 S.Ct. at 903.

4. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543, 105 S.Ct. 1487, 1494, 84 L.Ed.2d 494 (1985).

5. *Johnson v. Board of Regents of Univ. of Wisconsin,* 377 F.Supp. 227, 236 (W.D.Wis.1974), *aff'd without opinion,* 510 F.2d 975 (7th Cir. 1975).

6. 736 F.2d 283 (5th Cir.1984).

7. *Id.* at 289 (citing *Thurston v. Dekle,* 531 F.2d 1264, 1273 (5th Cir.1976), *vacated on other grounds,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978)).

8. *Id.* at 290 n. 12 (emphasis added).

9. *See Bignall v. North Idaho College,* 538 F.2d 243 (9th Cir.1976).

10. *See Klein v. Board of Higher Educ.,* 434 F.Supp. 1113 (S.D.N.Y.1977); *Johnson,* 377 F.Supp. at 240.

for example, the Wisconsin state legislature reduced funding to the University of Wisconsin system, making it impossible for the system to continue to pay all of its tenured faculty.[11] The chancellors of the system's campuses were left to determine, according to various criteria, how to allocate the reduced funds among the various educational programs at their campuses, and, based partly on those funding decisions, which *particular* faculty members to dismiss.[12]

In this case, the decisions to eliminate entirely given academic programs had an immediate and deleterious impact on the protected property interests of *particular* faculty members. In other words, the particular firings at issue in this case were not the unfortunate end result of a relatively remote and impersonal series of funding decisions. Rather, they were a primary and intended consequence of President Rutford's decisions: The TERC report noted, for example, that abolition of the Special Education program "would also eliminate the faculty positions not required to sustain the doctoral program in Human Development and Communication Science." The procedural protections due appellants must therefore account for the importance of appellants' private interests in President Rutford's program-elimination decisions.

## B. *The Governmental Interest*

Appellants concede that the university's decisions to eliminate the Special Education and Environmental Sciences programs were reasonable and were taken in good faith. We believe that holding, as appellants urge, that due process requires individual adversarial hearings for each faculty member terminated pursuant to such decisions would seriously impair the universi-

ty's significant interest in administering its educational programs in the manner it deems best.

" 'By and large, public education in our Nation is committed to the control of state and local authorities.' "[13] The federal courts, therefore, have been reluctant to impose due process requirements on public colleges and universities when doing so might compromise the state's ability to administer them effectively. For example, while holding that the Fourteenth Amendment affords terminated faculty the right to challenge the application of criteria used by universities to determine whom to dismiss in cases of financial exigency, the courts have uniformly held that terminated faculty have no right to participate in formulating those criteria, and no right to a hearing prior to the decision to terminate.[14] "[W]here lack of funds necessitate[s] releasing a sizeable number of the faculty, certainly it [is] peculiarly within the province of the school administration to determine which teachers should be released, and which retained."[15] The procedural calculus made in these cases no doubt rested in part on what the courts perceived to be a diminished private interest in challenging relatively remote administrative decisions, as noted above. Nevertheless, underlying each of these decisions is another, more compelling theme: the federal courts will not use the Fourteenth Amendment as an excuse to regulate the internal affairs of public universities.

There are no better examples of this respect for the integrity of local decision-making authority with regard to education than the Supreme Court's decisions in *Goss v. Lopez*[16] and *Board of Curators v. Horowitz*.[17] In *Goss*, the Court held that students are entitled to a due process hearing

---

11. *Johnson,* 377 F.Supp. at 230.

12. *Id.* at 231, 237–39.

13. *Board of Curators v. Horowitz,* 435 U.S. 78, 91, 98 S.Ct. 948, 955, 55 L.Ed.2d 124 (1978) (quoting *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968)).

14. *Bignall,* 538 F.2d at 245–46; *Klein,* 434 F.Supp. at 1118; *Johnson,* 377 F.Supp. at 237–39.

15. *Levitt v. Board of Trustees,* 376 F.Supp. 945, 960 (D.Neb.1974).

16. 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

17. 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978).

before being suspended from school for nonacademic reasons because "effective notice and an informal hearing ... will provide a meaningful hedge against erroneous action."[18] The hearing provided, however, need be no more than an "informal give and take between student and disciplinarian" that gives the student "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."[19] Careful not to intrude unduly into the "teaching process," however, the Court made clear that students were not constitutionally entitled to counsel, to confront adverse witnesses, or present witnesses of their own.[20]

The *Horowitz* Court paid even greater deference to local decision makers, holding that students dismissed for academic deficiency need be accorded no hearing at all. "A school is an academic institution, not a courtroom or administrative hearing room," and "[a]cademic evaluations ... bear little resemblance to ... judicial and administrative fact-finding proceedings."[21] Academic judgments, the Court reasoned, are "by [their] nature more subjective and evaluative than the typical fact question" and "require[ ] an expert evaluation of cumulative information ... not readily adapted to the procedural tools of judicial or administrative decisionmaking."[22]

## C. Risk of Erroneous Deprivation

We perceive little risk that program-elimination decisions of the sort at issue here will be made "erroneously," at least as that term is used in this context. University officials, no less than corporate officers, generally are charged with acting in the best interests of the university. There is no evidence in the record that they will fail diligently to pursue information relevant to their decision or will wilfully disregard such information brought to their attention through informal channels.

On the other hand, we perceive the risk that a particular faculty member will be terminated erroneously to be somewhat greater under the rather unusual facts of this case. Unlike many, if not most, institutions of higher learning, faculty in the University of Texas system are tenured to their particular component *institution* rather than to a particular school or program within that institution.[23] In other words, the faculty in this case were tenured to the University of Texas at Dallas, not to the School of Natural Sciences and Mathematics or the School of Human Development. Consequently, UTD faculty had a right of continuing appointment to the University of Texas at Dallas as a *whole*, and not merely to their particular schools or academic programs. Furthermore, the record indicates that a number of appellants were well qualified to teach in disciplines still offered at UTD—"environmental" science, for example, is merely a specialized application of expertise in the hard and social sciences, not a distinct scientific discipline. Unless the procedures afforded appellants meaningfully considered whether each appellant should be retained at UTD in *some* teaching capacity, then the risk that a given faculty member could be terminated erroneously seems to us patent.

## D. Was Due Process Satisfied?

After considering the interests noted above, we conclude that (1) the summary judgment evidence establishes that due process was satisfied with respect to the program-elimination decisions; and (2) material issues of fact remain on the question whether due process was satisfied with respect to the individual termination decisions.

18. *Goss*, 419 U.S. at 583, 95 S.Ct. at 741.

19. *Id.* at 581–84, 95 S.Ct. at 740–41.

20. *Id.* at 583, 95 S.Ct. at 740.

21. *Horowitz*, 435 U.S. at 88–89, 98 S.Ct. at 954–55.

22. *Id.* at 90, 98 S.Ct. at 955.

23. Board of Regents' *Rules and Regulations* § 6.2.

### 1. The Program–Elimination Decisions

■ While the appellants' interest implicated by the program-elimination decisions is significant, the paramount importance to UTD of pursuing its academic mission as it deems best and the minimal risk of error lead us to conclude that only the barest procedural protections of notice and an opportunity to be heard need be afforded the individual faculty member. UTD met and exceeded that standard in this case. Appellants were given twenty-months notice that the programs were to be phased out, and were repeatedly invited to meet with their respective deans, Vice President Clark, or President Rutford to discuss "the facts that were considered in reaching [the] decision[s] and ... to demonstrate that those facts were in error." That is all that due process requires.

Even if the Fourteenth Amendment does require some pre*decision*, as distinct from pre*termination*, process—though we do not believe it does—it was satisfied in this case. The summary judgment record establishes that the faculty in both programs were at least on constructive or inquiry notice that the programs were being considered for termination. The TERC report recommending that the Special Education program be eliminated was issued *four years* before that recommendation was implemented. Dean Dunn made his initial recommendation to eliminate Environmental Sciences *three years* before that program was eliminated. There is no evidence that any of this predecision activity was covert or surreptitious, and there is substantial evidence that it was in fact notorious. The notice element was thus satisfied.

Furthermore, we believe the faculty's right to be heard was satisfied by the opportunity to participate in a meaningful fashion in the decision-making process; that is, the faculty, though it lacked any decision-making authority, had the opportunity to contribute to the decision-making process and to have its contributions fairly considered. With respect to the Special Education program, the record demonstrates that Dean Tighe and Professor Fair submitted written objections to the TERC report on behalf of the Special Education faculty, and Dean Tighe submitted written objections on behalf of the faculty to the CTE Subcommittee report. With respect to the Environmental Sciences program, the record indicates that Dean Dunn discussed the program's bleak future in numerous meetings with appellant Professor Cale, head of the Environmental Sciences faculty, and with the whole faculty on at least two occasions, both prior to and after recommending the program's termination. Indeed, Professor Cale wrote a memorandum to Dean Dunn asserting factual data that he believed indicated the program's revival. The faculty was given a meaningful opportunity to be heard.

### 2. The Termination Decisions

■ The combined weight of the appellants' private interest and the greater possibility of an erroneous termination lead us to conclude that due process required more of UTD with respect to President Rutford's decision to terminate individual faculty members. Because UTD faculty are tenured to the *institution*, each appellant was entitled to a meaningful opportunity to demonstrate that, even if his or her program was to be discontinued and the number of faculty positions associated with that program eliminated, he or she should nevertheless be retained to teach in a field in which he or she is qualified.

■ We do not believe affording faculty such an opportunity would unduly interfere with the university's interest in academic freedom. A procedure ensuring that (1) an instructor was not terminated for constitutionally impermissible reasons, (2) the administration's actions were taken in good faith, and (3) objective criteria were employed and fairly applied in determining whom, from *among the faculty at large*, to terminate, is all that the Fourteenth Amendment requires.[24]

24. *Bignall,* 538 F.2d at 245; *Klein,* 434 F.Supp. at 1118–19; *Johnson,* 377 F.Supp. at 240; *see* *Russell,* 736 F.2d at 290 n. 12; *see also Hatcher*

■ Because only the last is in issue in this case, the procedure UTD employed might have been very simple indeed. Initially, the administration probably need only consider, in good faith, a written submission from each affected faculty member setting out why he or she deserves to be retained. Only if a particular faculty member makes a colorable showing that, under the objective criteria the university employs, he or she deserves to be retained in another academic program, must any sort of "hearing" be offered. Otherwise, a brief written statement from the decision maker of the reasons why the faculty member does not deserve to be retained would suffice. The "hearing" offered need only be an opportunity for the aggrieved faculty member to meet with the ultimate decision maker, to present his or her case orally, and to explore with the decision maker the possible alternatives to termination. If the decision maker nevertheless decides not to retain the faculty member, a written statement of reasons is required. Of course, if the retention of one faculty member results in the displacement of another, the displaced faculty member is equally entitled to due process.

■ Appellants argue that no procedure would be adequate unless (1) the hearing was conducted before a decision maker *other* than the university official responsible for the initial termination decision, and (2) the aggrieved faculty member is afforded the right to the presence of counsel, to cross-examine adverse witnesses, to present documentary and testimonial evidence, and to have a written record of the proceedings made. For the most part, we disagree.

"[A] fair tribunal is a basic requirement of due process."[25] Nevertheless, the federal courts have not been overly concerned with the identity of the hearing decision maker in academic-termination cases. Contrary to appellants' argument, a due process hearing is not rendered constitutionally inadequate solely because university administrators are asked to review their own decisions. This court has specifically "decline[d] to establish a *per se* rule that would disqualify administrative hearing bodies ... from hearing internal university matters solely for the reason that ... some of [the members] participated in the initial investigation of the incident and initiation of the cause under consideration."[26] Rather, "[a]lleged prejudice must be based on more than mere speculation and tenuous inferences,"[27] and the burden of proving bias is on the complainant.[28]

The Ninth Circuit stated a similar standard in *Bignall v. North Idaho College*,[29] noting that in the academic context "courts have balanced the need for an objective decision-maker against the costs of employing outside people, administrative efficiency and the body's having some expertise in institutional structure."[30] The hearing board in *Bignall* was the college Board of Trustees, which had "ordered the cut [in faculty] and ... was concerned with the financial operation of the college." Where the appellant gave the court "no facts which show the prejudice of th[e] Board,"[31] prejudice would not be presumed. This view is supported in principle by a number of Supreme Court decisions,[32] and we see no need to depart from it here. Absent affirmative evidence of bias, the

*v. Board of Public Educ.*, 809 F.2d 1546, 1553–55 (11th Cir.1987).

25. *Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)).

26. *Duke v. North Texas State Univ.*, 469 F.2d 829, 834 (5th Cir.1972), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2760, 37 L.Ed.2d 160 (1973).

27. *Id.*

28. *Id.* (citing *Palmer v. Thompson*, 419 F.2d 1222, 1229 (5th Cir.1969) (Bell, J., concurring)),

aff'd, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971).

29. 538 F.2d 243 (9th Cir.1976).

30. *Id.* at 247.

31. *Id.*

32. *See Withrow*, 421 U.S. at 58, 95 S.Ct. at 1470; *Goss v. Lopez*, 419 U.S. 565, 581–82, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975); *Wolff v. McDonnell*, 418 U.S. 539, 570–71, 94 S.Ct. 2963, 2982, 41 L.Ed.2d 935 (1974).

official responsible for the original termination decision may conduct the hearing on whether to retain a given faculty member.

With respect to appellants' second argument, we have found no case directly addressing the degree of formality required by the Constitution in this or closely analogous situations. In most faculty-termination cases, the aggrieved instructor was afforded a relatively formal procedure as a matter of state law or institutional policy. We believe that the due process clause, of its force, requires little formality.

The rights to counsel and to confront adverse witnesses would little aid the truth-seeking process in this context, wherein the decision to terminate faculty positions is incident to the decision to terminate an entire academic program—a decision that, in the words of Justice Rehnquist, "bear[s] little resemblance to ... judicial and administrative fact-finding."[33] Quite simply, we see no need to test in an adversary fashion the veracity of witnesses or the reliability of evidence relied upon to make such a decision, and doing so would unduly disrupt the academic decision-making process. And because oral testimony would play no role or but a minimal role in such proceedings, a written record or its equivalent would be of little value.

On the other hand, we agree with appellants that the hearing process might greatly be aided, and the institutional interests in autonomy and economy not greatly disserved, by allowing faculty to offer documentary evidence in support of their cause and by requiring hearing officer(s) to issue written conclusions. Both practices would greatly encourage fundamental fairness and informed decision-making, and would aid in judicial review when a faculty member challenges the substance or procedure of a particular decision.

■ There is no evidence in the record that each individual appellant was afforded a meaningful opportunity to argue that he or she should be retained in spite of the elimination of the academic program in which he or she taught. Accordingly, summary judgment on this issue was inappropriate.

### E. *Did Appellants Waive Their Right to Complain?*

■ The Magistrate held that because the General Counsel's letter of October 6 offered appellants a meaningful opportunity to challenge their terminations, their failure to demand such a meeting waived their right to complain that they were denied due process. We have just held, however, that appellants were never offered an adequate opportunity to challenge President Rutford's faculty-termination decisions. Furthermore, the record establishes that appellants twice demanded hearings of the sort provided for in the Board of Regents' *Rules and Regulations*, the only grievance procedures of which they were aware, and that their demands were rebuffed each time. Accordingly, we hold that appellants did not waive their right to challenge the termination decisions where they actively sought to invoke the procedures to which they in good faith thought themselves entitled, and were not offered a constitutionally adequate alternative. Only where "faculty members *know* that the opportunity for [an adequate] hearing is available and *choose* to forego that opportunity, [do] they act at their peril."[34]

### III.

■ Appellants argue that the Magistrate erred in holding that the defendant university officers sued in their individual capacities were entitled to qualified immunity. We disagree. Whether a government official is entitled to qualified immunity "generally turns on the 'objective reasonableness of the action' assessed in light of the legal rules that were 'clearly established' at the time it was taken."[35] The

---

**33.** *Horowitz,* 435 U.S. at 89, 98 S.Ct. at 955.

**34.** *Russell v. Harrison,* 632 F.Supp. 1436, 1442 (N.D.Miss.1986) (emphasis added), *aff'd without opinion,* 815 F.2d 698 (5th Cir.1987).

**35.** *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted).

law is "clearly established" if "[t]he contours of the right [asserted are] sufficiently clear that a reasonable official would understand that what he is doing violates that right," [36] that is, if "in the light of pre-existing law[,] the unlawfulness [of the act is] apparent." [37]

■ As noted above, this is a case of first impression, and it is a close one at that. We believe that a reasonable official could have believed that appellants were afforded procedural due process. There was a fair amount of input from the faculty and their deans prior to the decisions to eliminate the programs, and appellants were offered the opportunity to challenge those decisions after they were made. Even after the fact, clearly distinguishing between the program-elimination and employee-termination decisions is conceptually difficult; prospectively, the distinction probably seemed immaterial, as, indeed, the university's General Counsel believed it to be.

Finally, we note that appellants have not challenged the Magistrate's holdings that the Texas Faculty Association lacked standing to bring this suit and that UTD and the Board of Regents were entitled to Eleventh Amendment immunity. Therefore, however the caption of this decision may read, those issues are not before us, and the judgment below is final with respect to those parties.

For the foregoing reasons, the judgment of the Magistrate is AFFIRMED in part and REVERSED in part, and the cause REMANDED for proceedings consistent with this opinion.