UNIVERSITY OF TEXAS MEDICAL
   SCHOOL AT HOUSTON, M. David Low,
   M.D., and John Ribble, M.D., Appellants,

v.

Allan THAN, Appellee.

No. 01–93–00199–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 7, 1994.

Rehearing Denied May 5, 1994.

Dan Morales, Will Pryor, Mary F. Keller, Jorge Vega, Leo L. Barnes, for appellants.

Bruce A. Coane, Joyce A. Keating, Houston, for appellee.

Before OLIVER–PARROTT, C.J., and WILSON and HUTSON–DUNN, JJ.

## OPINION

WILSON, Justice.

The University of Texas Medical School at Houston (the School), M. David Low, M.D., and John Ribble, M.D., appeal from the grant of a permanent injunction obtained against them by Allan Than, a student at the School. After a bench trial, the court ordered the School to, among other things, (1) remove from Than's records an "F" assigned to him as a grade on a surgery exam, (2) remove from his records all documents showing Than's expulsion from the School and all documents evidencing the charge of cheating leveled at Than by the School, (3) treat Than as a student who graduated in good standing when responding to requests for information from residency programs and potential employers, and (4) issue Than a diploma and all documents necessary for his participation in residency programs. We affirm.

### Fact Summary

On February 22, 1991, Than, then a third-year medical student at the School, sat with some of his classmates for a National Board of Medical Examiners (NBME) exam in surgery. The test was supervised by proctors. During the exam, two of the proctors observed Than repeatedly looking in the direction of the answer sheet of another student, Ted Chiang. The proctors reported their observations to Dr. Margaret McNeese, the Associate Dean for Student Affairs.

Dr. McNeese sent Than's and Chiang's test results to the NBME for a statistical

analysis. Dr. Kelley of the NBME responded, but his letter was inconclusive regarding whether it was probable that Than had cheated.

On March 12, Dr. McNeese informed Than that he was accused of cheating on the exam. She and Than met on March 18 in order to discuss the charge. Than denied any wrongdoing.

In a letter dated April 4, 1991, Dr. McNeese advised Than that he was formally charged with committing "academic dishonesty" during the NBME exam. The letter informed Than that the hearing on the charge of academic dishonesty would be held on April 18, 1991.

At the hearing, Than represented himself, and Dr. McNeese represented the School. The parties introduced evidence, examined witnesses, and engaged in oral argument. Dr. Yvonne Russell, the Assistant Vice President for Student Affairs, served as hearing officer. Dr. Russell was selected for this position by the School.

On April 28, Dr. Russell issued her decision. She found sufficient evidence to support the charge of cheating and recommended that Than be expelled. Than's grade on the NBME exam was changed from a "B" to an "F" and he was dismissed from school.

With the assistance of legal counsel, Than appealed his expulsion to Dr. Low, who is President of the University of Texas Health Science Center at Houston. On May 9, Than received a letter from Dr. Ribble, Dean of the School, informing him that he could not participate in any clinical clerkships at the School unless and until Dr. Low "reverse[s] the decision of the hearing officer." Dr. Low upheld Than's expulsion.

On May 24, Than filed suit against the School, Dr. Low, and Dr. Ribble. Claiming that his right to due process had been violated and that the School had breached a contract with him, Than sought temporary and permanent injunctive relief. He asked the court to order the School to reinstate him.

The contract claim was eventually disposed of by summary judgment.

The case was removed to federal court, where Than obtained a temporary restraining order allowing him to continue his studies. The case was then returned to state court, where Than was granted a temporary restraining order, and, on November 26, 1991, a temporary injunction. The temporary injunction allowed Than to complete his medical education pending a decision on whether to issue a permanent injunction.

The School, Dr. Low, and Dr. Ribble appealed the grant of the temporary injunction. Prior to oral argument in the appeal, Than asked us to find the School in contempt for an alleged violation of the temporary injunction that occurred when the School refused to submit a certificate of professional education to the University of Virginia Health Science Center. Than had been accepted for a residency there, and the certificate was necessary for his temporary licensure as a Virginia medical resident. We entered remedial orders, requiring the School to allow Than to participate in graduation proceedings but not requiring it to issue him a diploma at the ceremony, and reserved our ruling on the motion for contempt until the submission of the appeal of the temporary injunction. See *University of Texas Medical School v. Than*, 834 S.W.2d 422, 423–24 (Tex. App.—Houston [1st Dist.] 1992, no writ) (*Than I.*).

We upheld the temporary injunction and denied Than's motion for contempt. See *University of Texas Medical School v. Than*, 834 S.W.2d 425, 432 (Tex.App.—Houston [1st Dist.] 1992, no writ) (*Than II* ). On June 18, 1992, Than filed an amended emergency motion for contempt in the trial court. On June 23, the trial court found the defendants in contempt and ordered the School to issue the certificate.

The defendants sought mandamus relief. We denied their writ of mandamus. See *University of Texas Medical School v. O'Neill*, No. 01–92–00665–CV (Tex.App.—Houston [1st Dist.], June 30, 1992, orig. pro-

ceeding) (unpublished). The School then filed a motion for emergency stay and motion for leave to file writ of mandamus in the Supreme Court of Texas. That court granted the School's motion for emergency stay, ordering that the trial court's contempt order "is ordered stayed pending further order of this Court." *See University of Texas Medical School v. O'Neill*, 35 Tex.Sup.Ct.J. 990 (July 1, 1992). Than moved to have the stay lifted; the supreme court denied relief. *See University of Texas Medical School v. O'Neill*, 35 Tex.Sup.Ct.J. 1108 (July 8, 1992). The court noted that its stay order "does not preclude pre-trial discovery or a trial on the merits." *See id.*

The case was tried before the bench from October 2 until October 7. On December 31, the supreme court lifted its stay of the contempt order. Than again urged his motion for contempt, but the trial court, after a hearing on January 8, 1993, refused to enforce its contempt order.

On January 11, the trial court signed a permanent injunction in favor of Than. As noted above, the court ordered the School to, among other things, (1) remove from Than's records an "F" assigned to him as a grade on a surgery exam, (2) remove from his records all documents showing Than's expulsion from the School and all documents evidencing the charge of cheating leveled at Than by the School, (3) treat Than as a student who graduated in good standing when responding to requests for information from residency programs and potential employers, and (4) issue Than a diploma and all documents necessary for his participation in residency programs. In three points of error, the appellants challenge the permanent injunction.

## Point of Error I

The appellants' first point of error is as follows:

As a matter of law, the trial court erred in finding that Than was denied due process because there was no evidence to support the conclusion that Than was denied the due process required in an academic discipline context.

## 1. The standard of review

■ In deciding a "no evidence" point, we consider only the evidence and inferences that, viewed in their most favorable light, tend to support the finding. *Lester Goodson Pontiac v. Elliott*, 775 S.W.2d 395, 398 (Tex. App.—Houston [1st Dist.] 1989, writ denied). We disregard all evidence and inferences to the contrary. *Id.* If there is probative evidence, more than a scintilla, in support of the finding, the "no evidence" point will be overruled. *Id.*

■ Whether to grant a permanent injunction is within the sound discretion of the trial court. *Isuani v. Manske–Sheffield Radiology Group*, 805 S.W.2d 602, 606 (Tex. App.—Beaumont 1991, writ denied). On appeal, review of the trial court's action is usually limited to whether the action was an abuse of that discretion. *Id.* at 606–607.

Point of error one presents two preliminary questions: (1) Was Than entitled to due process in the first place? (2) If so, what process was due?

## 2. Was Than entitled to due process?

In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the United States Supreme Court made the following observation:

Since the landmark decision of the Court of Appeals for the Fifth Circuit in *Dixon v. Alabama State Board of Education*, 294 F.2d 150, *cert. denied*, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), the lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion.

419 U.S. at 576 n. 8, 95 S.Ct. at 737 n. 8. An example is *Esteban v. Central Missouri State College*, 415 F.2d 1077 (8th Cir.1969). In *Esteban*, two students at the defendant college were put out of school for two semesters (with the right thereafter to apply for read-

mission) for their involvement in unruly campus demonstrations. *Id.* at 1079–80. The Eighth Circuit held that, while "a college has the inherent power properly to discipline," it is also true that "procedural due process must be afforded[.]" *Id.* at 1089.

■ This Court has followed federal authorities on the issue. We have recognized that, when a student is dismissed from a state university, the requirements of procedural due process apply. *See, e.g., Than II,* 834 S.W.2d 425; *Eiland v. Wolf,* 764 S.W.2d 827 (Tex.App.—Houston [1st Dist.] 1989, writ denied) (dismissal from University of Texas Medical Branch at Galveston); *University of Houston v. Sabeti,* 676 S.W.2d 685, 687–88 (Tex.App.—Houston [1st Dist.] 1984, no writ) ("Attendance at a state university is an interest protected by the due process clause of the fourteenth amendment[.]").

Than was entitled to procedural due process here. "Once it is determined that due process applies, the question remains what process is due." *Goss,* 419 U.S. at 577, 95 S.Ct. at 738 (quoting *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)); *see also Than II,* 834 S.W.2d at 430. We now turn to that issue.

### 3. What process was Than due?

■ The answer to this question turns on whether Than's dismissal was for an academic reason or a disciplinary one. *See Board of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 953, 55 L.Ed.2d 124 (1978); *Eiland,* 764 S.W.2d at 833. A dismissal for academic reasons "calls for far less stringent procedural requirements" than a dismissal for disciplinary reasons. *Horowitz,* 435 U.S. at 86, 98 S.Ct. at 953; *see also Eiland,* 764 S.W.2d at 833.

In *Than II,* we held that Than's dismissal was disciplinary. 834 S.W.2d at 430. The appellants now argue, however, that the reason for Than's dismissal, cheating, is academic in nature, not disciplinary.

We disagree. We acknowledge the appellants' position that "[a]ll cheating on exams arises in a academic context." This assertion, however, speaks to the *backdrop* of the act of cheating, *not* to the nature of the act itself. The *act* of cheating is, by nature, dishonest and deceitful. It is to achieve a grade, not by becoming duly entitled to it, but by representing to the institution that the answers expressed on an exam came from the student's own bank of knowledge, when in fact they were obtained insidiously. Cheating is a misdeed.

A potential consequence of a misdeed is punishment. However, it is not a misdeed to perform unsatisfactorily at one's studies or activities related to those studies. It is this want of satisfactory performance that leads to an academic dismissal. Academic dismissal occurs when the student did not achieve the minimum standards by which the student's fitness to practice the profession for which he or she is preparing are measured. *See, e.g., Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 216, 106 S.Ct. 507, 508, 88 L.Ed.2d 523 (1985); *Horowitz,* 435 U.S. at 90, 98 S.Ct. at 955. In such a case, dismissal is not punishment; it is discarding as unfit. Dismissal for a misdeed, however, is punitive. It is therefore disciplinary, not academic. A dismissal for the misdeed of cheating is a disciplinary dismissal.

■ Having made that holding, we now consider what due process requires when a student is dismissed for disciplinary reasons. Notice of the charges, notice of the evidence to be used against the student, and a hearing are required. *Eiland,* 764 S.W.2d at 833; *see Sabeti,* 676 S.W.2d at 689; *Esteban,* 415 F.2d at 1089. "The due process clause requires only fundamental fairness; it does not require that every dispute with a government agency be resolved as a lawsuit would be." *Sabeti,* 676 S.W.2d at 689. "[S]chool regulations are not to be measured by the standards which prevail for the criminal law and for criminal procedure[.]" *Esteban,* 415 F.2d at 1090. "[C]ourts should interfere only where there is a clear case of constitutional infringement." *Id.* We first consider whether the School complied with the requirement of notice of the charges.

### 4. The notice of the charges against Than

The appellants challenge the trial court's findings that the School failed to confront Than with the charges against him in a manner that was timely by due process standards. The record reflects the following evidence on this issue.

Than took the NBME exam on February 22, 1991. The School learned of the alleged cheating incident during the exam, when the proctors witnessed the event and informed Dr. McNeese. The School's rules provide that:

> If a proctor suspects cheating during an examination, he/she will schedule a meeting with that student after the examination. It is suggested that the meeting include another person, possible [sic] the Course Director, to serve as a witness.

> A member of the faculty who has evidence that a student is cheating during an examination session will approach the student and escort him/her outside the examination room. The student must surrender his/her paper and any items not of a personal nature suspected in aiding the student in his/her cheating [ ].

It is undisputed that the School did not comply with these rules.[1]

Than was not informed of the charge of cheating until 18 days after the exam, on March 12, during a meeting with Dr. McNeese. The notice, however, consisted of Than being told only that someone had "turned me in or accused me of cheating" during the exam. He was not told who had accused him (despite asking), or provided any specifics whatsoever. Furthermore, he was advised not to obtain an attorney for the hearing, in part because, with an attorney involved, "it could drag out for years." [2]

In a letter dated April 4, Dr. McNeese advised Than that he was charged with committing "academic dishonesty" during the NBME exam. The letter informed Than that the hearing on the charge of academic dishonesty would be on April 18. While the letter informed Than that "at least two witnesses will testify that they saw you repeatedly looking at the test paper of another student," it did not state who the two witnesses were or give the identity of "another student."

After Than received the April 4 letter, he began to contact potential witnesses who could testify regarding seating positions in the exam. By this time, however, these students had forgotten where they had sat during the exam. One asserted that he had sat behind Than, so Than called him as a witness at the hearing to testify regarding seating position. It was determined during the hearing that the witness' memory about where he had sat during the exam was mistaken. Another witness who thought he had also sat behind Than turned out to be wrong, as well; actually, he had sat beside him.

"There are no hard and fast rules by which to measure meaningful notice." *Nash v. Auburn Univ.*, 812 F.2d 655, 661 (11th Cir.1987). Rather, due process notice must be "appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470

---

1. We are cognizant of, and agree with, the rule that a university's failure to follow its own rules and regulations is not a per se violation of due process. *See Levitt v. University of Texas*, 759 F.2d 1224, 1230 (5th Cir.1985); *Than II*, 834 S.W.2d at 436 (Dunn, J., dissenting).

2. As we observed in *Sabeti*, 676 S.W.2d at 688, one case, *Esteban v. Central Missouri State College*, 277 F.Supp. 649, 651–52 (W.D.Mo.1967), *aff'd*, 415 F.2d 1077 (8th Cir.1969), held that due process *requires* that counsel be present to advise a student at a hearing. The Eighth Circuit, however, in affirming *Esteban*, did not address the right to counsel. In another case, *Texarkana Indep. Sch. Dist. v. Lewis*, 470 S.W.2d 727, 735 (Tex.Civ.App.—Texarkana 1971, no writ), one justice (there were three separate opinions) wrote that a high school student has a *right* to counsel "should the matter appear to him to be of sufficient gravity to make legal assistance desirable[.]" While we do not address the issue of whether Than had a right to counsel at the dismissal hearing because it is not raised by the parties or necessary to our disposition of this case, as in *Sabeti*, we do not endorse either holding.

U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950)). The sufficiency of due process notice "must be judged in the light of the parties, the subject matter and the circumstances involved." *Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir.1970).

As the transcription of the hearing makes clear, the crucial issue regarding whether Than cheated on the exam was seating position. The School's theory was that Than had looked several times at the answer sheet of a student seated in front of him to his left, and had copied answers from that paper. An obviously necessary component of this theory is that Than could see that student's answer sheet, and that he was close enough not just to see it, but to read it. Even by April 4, however, the School kept the other student's identity from Than. By the time Than received the April 4 letter and learned that seating position, and thus where he could see and couldn't see, was a key issue in the matter, the witnesses that could possibly have testified in his defense had forgotten critical details regarding who sat where in the exam. This fact was demonstrated at the hearing, where Than's witnesses were unable to recall even where they themselves had sat.

■ As a result, the trial court found that the appellants' "lengthy delay in advising [Than] of the charges against him materially disadvantaged his ability to investigate and prepare his defense to the charge of academic dishonesty," and that "the university's failure to confront and explain the circumstances surrounding the suspicion of cheating to [Than] in a more timely manner substantially impacted [Than's] ability to meaningfully respond to the charge." As demonstrated above, these findings are supported by the evidence.

On March 12, the "notice" to Than amounted to no more than telling him that he was accused of cheating. The April 4 letter told

him how he had allegedly cheated—by looking on the paper of another student—but no more on the subject. In this case, where seating position was the critical issue on the matter of whether Than cheated during the exam, timely notice to Than was essential so that he could contact potential witnesses in his favor before they forgot seating details that to them were completely unimportant, but which to Than were critical.[3] In this case, then, due process "notice of the charges" called for more than the School provided. The School should have told Than earlier than 18 days after the exam that he was accused of cheating, and earlier than 41 days after the exam how he had allegedly cheated. Considering "the subject matter and the circumstances involved," the School's notice of the charges was constitutionally untimely.

Relying on *Nash*, the appellants argue that their notice to Than of the charges was timely. In that case, two students were suspended from veterinary school for academic dishonesty. 812 F.2d at 656. After a disciplinary hearing, a student board voted unanimously that the accused students were guilty and recommended that they be suspended from school with the opportunity to apply for admission again in one year. *Id.* at 658. The board's recommendation was upheld through the school's appeals process. *Id.* at 659.

The appellants argued that their notice of the charges was inadequate for the purposes of procedural due process. 812 F.2d at 661. The exam on which they were accused of cheating was on May 16. *Id.* at 659. They were advised of the charges on June 6, and a hearing was set for June 10. *Id.* at 657. The hearing date was later changed to June 12. *Id.*

■ The Eleventh Circuit held that notice was sufficient. 812 F.2d at 662. However, the students in that case:

(1) were suspended with eligibility to apply again in one year, *id.* at 659, not dis-

---

**3.** The School and Than lost the benefit of the School's own rule that calls for an accused stu- dent to be confronted with the issue during the exam.

missed, as was Than;[4]

(2) were advised by an attorney at the hearing, *id.* at 658, whereas Than was not, and had in fact been discouraged by an adverse party from obtaining counsel for the hearing;

(3) actually specifically agreed to the hearing date of June 12, *id.* at 658, whereas Than did not specifically agree to his hearing date;

(4) had sufficient time to garner favorable evidence to present at the hearing, *id.* at 662, whereas the record here demonstrates that Than's efforts to investigate his case and acquire supporting documentation, particularly from the NBME, were severely hampered by his rotation schedule;

(5) argued that there was not enough time between the notice of the charges and the hearing, *id.* at 661, whereas this case involves a different complaint of untimeliness, one alleging that there was too much time between the alleged cheating incident and notice of the charges.

We conclude that *Nash* is not analogous.

### 5. The notice of the evidence to be used against Than

█ The appellants also challenge the trial court's finding that the School's notice of the evidence to be used against Than was deficient. The record reflects the following evidence on this issue.

Dr. McNeese, under cover of a memorandum dated April 11, 1991, provided Than "[c]opies of the documents that may be introduced at the hearing by the medical school[.]" Than received the package on April 12, a Friday. The hearing was scheduled for the morning of Thursday, April 18; therefore, Than had just five days to prepare, after being told for the first time who his accusers were, whose paper he had allegedly copied from, and what evidence would be used against him, for the hearing which would determine his future, or lack of same, in the School.

To compound matters, Than's clinical rotation schedule—assigned by the School—called for Than to work the weekend and also the following Monday, Tuesday, and Wednesday. Than worked from 6:00 a.m. until 6:00 p.m. on those five days.

It is undisputed that no advance notice was provided regarding the following evidence: (1) Than's grade in a specific psychiatry course; (2) statistical information, not contained in Dr. Kelley's letter, regarding a comparison between Than's exam paper and Chiang's exam paper; and (3) the statistical methodology explaining the analysis set forth in Dr. Kelley's letter. Yet all three of these items were relied on by the hearing officer, Dr. Russell, in making her recommendation to expel Than. In the letter detailing her findings, dated April 28, 1991, Dr. Russell stated:

Dr. McNeese pointed out that Mr. Than previously had academic problems in Psychiatry. Currently he states he wishes to become an anesthesiologist, which requires high academic standards for selection for residency. He therefore had a motive for trying to ensure that he had a good examination score in Surgery in order to maintain his current academic status and not to diminish it further by a poor surgery examination score. Dr. McNeese presented evidence from the NBME [ ] that the percentage of agreements for wrong answers by Mr. Than and Mr. Chiang was "well above the estimated percentages ... for large groups of examiners working independently."

Dr. Russell subsequently testified that she assumed that Dr. Kelley, in analyzing the

---

4. When a student is punished for disciplinary reasons, courts utilize a "sliding scale" to determine the adequacy of due process afforded the student. *Than II*, 834 S.W.2d at 430–31. The harsher the punishment, the more process the student is due. *See Goss*, 419 U.S. at 584, 95 S.Ct. at 741 ("Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures."); *Dixon*, 294 F.2d at 155 ("The minimum procedural requirements necessary to satisfy due process depend upon the circumstances and the interests of the parties involved.").

potential correlation between Than's wrong answers and Chiang's wrong answers, had factored into his analysis the "joint wrongs" of everyone who had taken the exam. This assumption, according to Dr. Kelley's letter, was incorrect. In the first paragraph of his letter, Dr. Kelley stated that the "analysis was done *for the one pair of examinees* whose names you provided." (Emphasis added.)

The trial court made the following findings, which are supported by the evidence and not disputed by the appellants, on the issue of the "statistical analysis" issue:

> [Than] was not advised that anyone would testify concerning the statistical analysis provided in Dr. Kelley's letter, and [Than] was provided an incomplete copy of that letter. The letter stated that of the total common wrong answers by [Than] and the student from which he was alleged to have copied, 88% were the same wrong answer. The letter was silent as to any comparison between this percentage and any control group or "standard" percentage, and the letter cautioned against drawing any conclusions from the analysis due to the small sample size involved in the review. At the hearing, however, Dr. McNeese added to the information concerning the analysis by testifying about a conversation she had with Dr. Kelley in which he indicated that approximately 40% common wrong answers was normal and that (despite the cautionary language in the letter) he found the 88% figure personally disturbing. Nowhere in the documents provided to [Than] or in the summary of the witness testimony provided to him is there any disclosure of this additional, comparative statistical information.
>
> . . . .
>
> [Than] was also not provided a complete copy of the letter and was deprived of the methodology used by the NBME in its analysis.[5]

Considering the foregoing evidence, and particularly its obvious significance to the

hearing officer, Dr. Russell, the School's notice to Than of the evidence to be used against him was constitutionally insufficient.

Relying on *Keough v. Tate County Bd. of Educ.,* 748 F.2d 1077 (5th Cir.1984), the appellants argue that we should "decline[ ] to burden academia with the detailed and restrictive notice requirement that the lower court applies" here. In *Keough,* a high school student, after notice and a hearing, was expelled for repeatedly misbehaving in school. *Id.* at 1079. The appellants complained that the Board's failure to supply them with a list of witnesses who would testify against the student at the hearing and a summary of their testimony violated procedural due process. *Id.* at 1081.

The Fifth Circuit disagreed, holding that the Board's not providing the appellants with such a list did not violate procedural due process in that case. 748 F.2d at 1082. The appellants argue that *Keough* is analogous to this case, and that, just as due process did not require the Board in *Keough* to provide a list of witnesses and a summary of their testimony to the appellants there, nor did due process require the School to notify Than that his grade in the specific psychiatry course, the statistical information, not contained in Dr. Kelley's letter, regarding a comparison between Than's exam paper and Chiang's exam paper, and the statistical methodology explaining the analysis set forth in Dr. Kelley's letter would be used as evidence against him at the hearing.

Finding *Keough* not analogous to this case, we disagree. In *Keough,* the Fifth Circuit based its holding on the issue in part upon the following facts:

> (1) The situation before the court concerned "a routine disciplinary matter within a public school," 748 F.2d at 1082, clearly not the case here.
>
> (2) The appellants "were fully apprised of ... the underlying facts supporting th[e] charges," not the case here, where Than

5. In the trial court, Than presented a statistical expert who, in very strong terms, specifically

attacked both the reliability of Dr. Kelley's analysis and the methodology used in forming it.

was not told, at the least, about Dr. McNeese's conversation with Dr. Kelley in which Dr. Kelley indicated that approximately 40% common wrong answers was normal and that 88% common wrong answers was personally disturbing. The statistical evidence was definitely "facts supporting the charges."

(3) "[T]he witnesses provided no surprises against which the Keoughs were unprepared to defend," not the case here, where the record shows evidence of Than's surprise at hearing the statistical evidence not contained in Dr. Kelley's letter.[6]

(4) "[T]he Keoughs suffered no material prejudice by proceeding to hearing before the school board without a witness list," not the case here, where Than's statistical expert could have attacked the unknown NBME statistical evidence at the School hearing, as he did in the trial court, had Than known that the evidence would be presented at the hearing.[7]

*Keough* is not comparable here.

### 6. The hearing

■■■ The appellants also challenge the trial court's finding that the hearing itself was

---

6. The statement of facts from the School hearing shows that Than was surprised by the unknown evidence to the point that he implied that the School had intentionally withheld it from him. After Dr. McNeese stated facts about her phone call with Dr. Kelley, the following transpired:

   Dr. McNeese: It was not—we were not withholding information from you.
   Than: So, when did you receive the phone call? What date?
   Dr. McNeese: Again, I don't know.... He called me to let me know that he was concerned.
   Than: Because on the 12th [of March] I asked you for more information about it [the NBME analysis]. But you apparently did not—
   Dr. McNeese: No. I couldn't give you that information at that time, as I was forbidden by the Regent's rules to give you more, anymore [sic] information than what was given to you in the letter.

7. Statistical evidence played an important part in this case. At the temporary injunction hearing, Dr. McNeese testified as follows:

   I was not willing to go ahead and call in a student and initiate a disciplinary hearing

tainted. The opportunity to be heard is a fundamental requisite of due process. *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970). The hearing should be conducted by "an impartial tribunal." *Dirt, Inc. v. Mobile County Comm'n*, 739 F.2d 1562, 1566 (11th Cir.1984). It must be conducted in a "meaningful manner." *Goldberg*, 397 U.S. at 267, 90 S.Ct. at 1020 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). "The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg*, 397 U.S. at 268–69, 90 S.Ct. at 1021. The record reflects the following evidence on this issue.

■■■ Dr. McNeese's April 11 memorandum to Than advising him what evidence would be introduced at the School hearing stated that the "NBME examination room, MSB 2.135 may be viewed if necessary." No one visited the exam room during the hearing. At the conclusion of the hearing, the following transpired:

Dr. Russell: All right. I believe that concludes the hearing.

Dr. McNeese: Do you want to look at this examination room or not?

without further corroboration [of the two proctors' statements].
The department of surgery ... called the National Board [the NBME] and told them of their concerns and had a schema of the individuals sitting in the room and took the individuals who were seated around Allan and asked them to do a correlation of their examination answer sheets with Allan Than's.
I then, probably two or three days before I called Allan in to talk to him about these allegations, had received a phone call from Dr. Kelly [sic] of the National Board where at that time he voiced his concern that there were high percentage of like wrong answers.
I said I'll wait until I receive written authorization of your concern. And when I received that, that piece of evidence coupled with the two allegations from the individuals in surgery prompted me to call him in.
The methodology used in forming Dr. Kelley's analysis was part of "that piece of evidence," but, as noted above, Than did not receive the methodology before the hearing.

Dr. Russell: Yes, I do.

The parties then went off the record; no more was recorded for the hearing's statement of facts.

Trial testimony demonstrated that Dr. Russell, the hearing officer, then proceeded to the exam room accompanied by Dr. McNeese, who was the School's representative at the hearing, and no one else. Than asked to come along, and was told not to:

> I also did ask her, too, I asked her after the record have been finished. She's walking out, I asked Dr. Russell can I come along and she say no, plain no. She told me she knew where the room was. That was off the record.

When Dr. Russell and Dr. McNeese arrived at the exam room, the proceedings were not reconvened. No record was made. Only Dr. Russell and Dr. McNeese were present for whatever occurred in the exam room.

Once again, Dr. Russell's written findings indicate that she placed significance on evidence to which Than was not privy. Dr. Russell wrote:

> Additionally, purposefully, I sat in the chair occupied by Mr. Than during the examination and could clearly see the paper from the examination chair occupied by Mr. Chiang.

She would later testify as follows:

Q. All right. Now, when you went to the exam room and you sat in Allan Than's chair, is that right?

A. I sat in all four chairs.

. . . .

Q. You're saying it was Dr. McNeese knew where all these seats were, so is she the one who told you in the exam room who sat where so you all could sit in those seats? Kind of directing traffic, so to speak?

A. That would be reasonable to expect, that was her role.

. . . .

Q. Okay. How tall was … Ted Chiang?

A. I don't know because I never saw him.

. . . .

Q. Do you know one way or the other if Chiang was covering his answer sheet at any time during the examination?

A. No, I don't know.

Q. Do you know whether Ted Chiang was leaning in order to block the answer sheet from Allan's view or whether he was sitting upright during the exam?

A. No, I don't know that, either.

. . . .

Q. Well, how could you say that his [Chiang's] answer sheet was in plain view, or you can't say that one way or the other?

A. I told you I can't say that, I don't know the answer to that.

As noted above, the record demonstrates that what Than could or could not see was a critical issue in regard to whether he cheated. Yet, when it came time to visit the scene of the alleged cheating and measure the possibility that Than could have seen, and read, Chiang's paper, the hearing officer was ushered solely by the School's representative, without the presence of the accused.[8] Additionally, her testimony reveals that she was ignorant of many key facts relevant to the question of whether Than could see and read Chiang's paper, such as Chiang's height, whether Chiang covered his answer sheet, and, most importantly, whether Chiang's answers were even in plain view for another student to see.

---

8. One of the proctors brought a seating chart of the exam room with her to the hearing and used it in her testimony. It is undisputed that Than did not have a copy of it, and that School officials did not have advance notice of its existence. The appellants argue that the School "cannot be held responsible for giving notice about that which it had no knowledge." The proctor, however, was an employee of the School. The appellants cite no authority regarding why the School should not be responsible for the act of its employee, whether it had advance notice that the act would occur or not.

Furthermore, the record demonstrates that the hearing officer actually thought *that the wrong party, Than, had a burden of proof at the hearing.* The School's rules provide that:

> Upon a hearing of the charges, the institutional representative has the burden of going forward with the evidence *and the burden of proving the charges by the greater weight of the credible evidence.*

(Emphasis added.) The rules place no burden of proof whatsoever on the accused student. Yet Dr. Russell testified that, "Both parties have the burden ... *[Than's] burden was to prove that he didn't cheat.*" (Emphasis added.)

Considering the obvious importance of Dr. Russell's visit to the exam room, and the obvious weight she gave her visit when she composed her written findings, we hold that the hearing was tainted by her visit to the exam room. We can conceive of no proper reason that the hearing officer would proceed to the exam room accompanied only by the School's representative, and not by the accused (who had in fact asked to come), and there continue a proceeding, making no record in the process, that had already been officially closed. This tainted the hearing for due process purposes,[9] as did the fact that the hearing officer mistakenly placed a burden of proof on Than.[10]

### 7. The School's violations of its own rules

The trial court also found that:

Defendants departed from their own guidelines concerning (1) confrontation of a student suspected of cheating; (2) notice of witnesses and the subject of their testimony; and (3) notice and copies of documents that may be offered for consideration at the disciplinary hearing. These deviations not only deprived [Than] of the protection of the school's formal rules governing disciplinary matters, but also, pertinent to this proceeding, deprived him of the minimal guarantees of due process afforded by the United States and Texas constitutions.

The appellants point out that, as we noted previously, a university's failure to follow its own rules and regulations is not a per se violation of due process. *See Levitt v. University of Texas,* 759 F.2d 1224, 1230 (5th Cir.1985); *see also Than II,* 834 S.W.2d at 436 (Dunn, J., dissenting). However, when a university's actions violate its own rules and also *in themselves* violate due process, there is a constitutional deprivation independent of the rules violations. *Levitt,* 759 F.2d at 1230.

As we have already held, the School violated Than's right to due process in, among other things, (a) not giving him timely notice of the charges, (b) not providing him timely notice of the evidence to be used against him, and (c) not providing him notice and copies of all of the evidence to be used against him. Thus, the trial court was correct in finding that the School's departures from its own guidelines "also ... deprived [Than] of the minimal guarantees of due process" notwith-

9. The appellants argue that, because Dr. McNeese's memorandum stated that the exam room "may be viewed if necessary," it was permissible for Dr. Russell to visit the room as she did. We find this argument disingenuous. A fair reading of Dr. McNeese's memorandum would be that any "necessary" viewing of the room would be done (a) as a legitimate part of the hearing process, (b) on the record like the rest of the hearing, and (c) with both sides present. It cannot be said that Than was on notice that the room would be viewed in the manner that Dr. Russell actually viewed it.

10. We do not hold that Dr. Russell's placing a burden of proof on Than violated Than's right to due process because it was against the School's rules for her to do so. Rather, we hold that this

contributed to the overall denial of due process to Than, because it is not consistent with due process to place a burden on a student accused of cheating to prove that he did not cheat. "[H]e who claims the existence of illegality must prove it." *Duvall v. Clark,* 158 S.W.2d 565, 569 (Tex. Civ.App.—Waco 1941, writ ref'd w.o.m.). We believe that principle applies here for due process purposes.

We also note another particularly applicable principle, stated by the United States Supreme Court: "*In all kinds of litigation, it is plain that where the burden of proof lies may be decisive of the outcome.*" *Speiser v. Randall,* 357 U.S. 513, 525, 78 S.Ct. 1332, 1341–1342, 2 L.Ed.2d 1460 (1958) (emphasis added).

standing the fact that the School's actions also violated its own rules. The trial court did not find that the fact that the School departed from its own rules actually *was* the violation of due process.

### 8. The appeal to Dr. Low

■ The appellants argue that:

Of further importance is the trial court's lack of recognition that the harm Than complains of cannot, and did not, arise until Dr. Low completed his review of the hearing. Dr. Russell, the hearing officer, only made recommendations.... It is Dr. Low's determination and not the hearing officer's recommendation that ultimately decided Than's case.

This argument ignores the fact that "the harm" of which Than complained, dismissal, occurred *before* Dr. Low completed his review, not after.[11]

In any event, the record indicates that Dr. Low reviewed a transcript of the tainted hearing, including the evidence of which Than was unaware prior to the hearing, and upheld Than's dismissal. The appellants argue that, because on appeal to Dr. Low Than could address those items of evidence that he was not prepared to address at the hearing, the alleged due process violations "were cured during the internal appeals process."

We disagree. Not even Than's new evidence and arguments could remedy the effect of the School's delay in notifying Than of the charges against him, which was that witnesses that could have been of aid to Than on the critical seating position issue forgot details critical to Than's defense. That problem could not be "cured."

Additionally, Dr. Low did not have, and could not have, a complete record in front of him to review. Whatever transpired in the exam room after the hearing was closed was not recorded; yet, Dr. Russell was at least persuaded enough by her visit to the room to include one of her observations from the

room in her written findings. The fact finder's review of a crucial piece of evidence—the scene of the alleged cheating—was not recorded for internal appellate review, a fact made all the more important by Than's being forbidden to be there when the School's representative *was* allowed to attend.

Relying on *Franceski v. Plaquemines Parish Sch. Bd.*, 772 F.2d 197 (5th Cir.1985), the appellants also argue that "[a] mere threat (such as the hearing officer's recommendation) to a protected interest is not sufficient to state a claim." In *Franceski*, an employee of a parish school board contended that the state deprived her of a constitutional right when it informed her by letter that she would not be hired for the next school term. *Id.* at 200. The Fifth Circuit disagreed, holding that the mere advance decision not to hire her for the next term was not a deprivation. *Id.*

Here, however, the School did not just "decide" or "threaten" to dismiss Than; it dismissed him. The deprivation in this case actually occurred, as opposed to being merely foretold. *Franceski* does not apply here.

### 9. Causation

The appellants also argue that any procedural due process violations did not cause the deprivation of Than's interest in a medical degree. The appellants refer us to language in *Laje v. R.E. Thomason Gen. Hosp.*, 665 F.2d 724, 729 (5th Cir.1982): "[I]f school officials could show that the suspensions were justified and would have taken place even if a proper hearing had been held, then no damages for injuries from the suspensions were recoverable."

■ The appellants have not shown, however, that Than would have been dismissed even if a proper hearing had been held. They argue that, because at the time Than appealed to Dr. Low, Than was aware of and responded to the evidence of which he was unaware before the hearing, and Dr. Low still rejected his appeal, then Than would

---

11. As noted above, Than was not reinstated until

he obtained a court order.

have been dismissed after the hearing even if he had been aware of the evidence then. We do not accept this assertion. Dr. Low, regardless of how prepared Than was for the evidence by the appeal, reviewed a result based, in significant part, on Than's inability to procure witnesses who could help his defense, Than's lack of time to adequately prepare a defense, and Dr. Russell's improper visit to the exam room. The result of the appeal to Dr. Low clearly does not indicate that Than would have been dismissed even without the due process violations.

## 10. Conclusion to Point of Error I

The trial court was correct in finding that Than was denied due process; this conclusion is supported by ample evidence. The cumulative effect of all of the infirmities in the School's pursuit of Than's dismissal denied him due process. Therefore, the trial court did not abuse its discretion in granting the permanent injunction. We overrule point of error one.

We have not decided, and cannot decide, whether Allan Than cheated on the NBME exam. We have decided that, before permanently depriving someone of an interest protected by the due process clause of the Fourteenth Amendment, as was Than's attendance at the School once he was admitted,[12] the proceedings must be of higher due process quality than those that took place here.

## Point of Error II

In their second point of error, the appellants contend that:

The trial court erred in its grant of the permanent injunction sought by Than because there is no evidence to support the conclusion that the procedural due process violations could not be cured, and thus at most, the remedy for procedural due process violations is an order requiring Than receive due process.

▮ Due process requires that a hearing be provided "at a meaningful time." *Louder-*

*mill,* 470 U.S. at 547, 105 S.Ct. at 1496 (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). The trial court signed the permanent injunction on January 11, 1993. The alleged cheating incident occurred on February 22, 1991, almost two years before the granting of the permanent injunction. By January 11, 1993, it was foreseeable, indeed probable, that potential witnesses had graduated and moved on. Dr. Low himself testified that "the medical school program" is four years long and that, afterward, students at the School "go into residency programs all over the world." Than himself completed medical school in May, 1992, and attended graduation ceremonies that June.

Because of these circumstances, it was essential that a fair, reliable hearing be had in this case at an early juncture. We do not believe that such a hearing could have been had at the time the trial court granted the permanent injunction, and we do not believe that a fair, reliable hearing could be had now, more than three years after the alleged cheating incident. It is far too late.

The appellants rely on *Connelly v. University of Vermont & State Agricultural College,* 244 F.Supp. 156 (D.Vt.1965), and *Texas Faculty Ass'n v. University of Texas,* 946 F.2d 379 (5th Cir.1991). Neither case addressed whether a particular delay before a hearing was constitutionally infirm or held that a new hearing must be the remedy when the original hearing violated due process.

In *Connelly,* a third-year medical student was dismissed for academic reasons. 244 F.Supp. at 158. He alleged that his dismissal was "wrongful, improper, arbitrary, summary and unjust." *Id.* The university moved for summary judgment. *Id.* The trial court denied the motion, and held that, should the plaintiff prevail on the issue of whether the university acted arbitrarily, capriciously, or in bad faith, the court would then order the university to give the plaintiff a fair and impartial hearing on his dismissal. *Id.* at 161. In *Connelly,* there had not yet

---

**12.** *See Sabeti,* 676 S.W.2d at 687–88.

*been* a hearing when the court stated that it would (conditionally) order one. That is not the case here.

In *Texas Faculty*, tenured faculty members were terminated incident to a university president's decision to eliminate the academic programs in which they taught. 946 F.2d at 381. The Fifth Circuit held that the faculty members were not afforded a meaningful opportunity to be heard on the decision to terminate their employment. *Id.* at 387. The court held that they should have been. *Id.* At the time the Fifth Circuit ruled, there had not yet *been* an opportunity to be heard. *Id.* at 383. Again, that is not the case here.

The School has already given Than an opportunity to be heard. Through no fault of Than's, the opportunity provided by the School violated due process. For the reasons set out above, we believe that another hearing this late would be constitutionally futile. We overrule point of error two.

### Point of Error III

In point of error three, the appellants assert that:

> The trial court erred as a matter of law by ordering UT to grant Than a medical degree because such an order is beyond the proper authority of the court.

The appellants refer to the trial court's order in the permanent injunction that the "defendants issue [Than] his diploma and all certificates necessary for his participation in any post-graduate residency program(s)."

We recognize that the University of Texas System Board of Regents is "authorized and directed to govern, operate, support, and maintain" the institutions in the System. TEX.EDUC.CODE ANN. § 65.31(a) (Vernon 1991). It is the Board that possesses the authority to offer degrees from institutions in the System. TEX.EDUC.CODE ANN. § 65.31(b) (Vernon 1991). However, matters within the Board's authority are subject to review by the courts if the Board abuses the authority vested in it. *See Foley v. Benedict,* 55 S.W.2d 805, 810 (Tex.1932).

The record reflects that Than has successfully completed all the course work necessary to obtain a degree. Resolution of the cheating issue is all that stands between Than and a degree.[13] The School did not resolve that issue consistent with due process, and now, due to the passage of so much time, *cannot* resolve it consistent with due process. In such a case—where Than has successfully completed all the necessary course work, where the only obstacle to his obtaining a degree is a hearing that violated one of his constitutional rights, and where a new hearing could not be constitutionally permissible—the Board has abused its authority in not awarding Than a degree.

The trial court was correct in ordering the appellants to issue Than a diploma. We overrule point of error three.[14]

### Conclusion

We affirm the trial court's grant of the permanent injunction in all respects.

HUTSON–DUNN, J., dissents.

13. If we agreed with the appellants, and, as they pray, hold that Than's right to due process was not violated (in which case his dismissal stands), or, in the alternative, nullify the permanent injunction and order that the School conduct a second hearing (in which case he may be dismissed again), he will not be presently entitled to a degree.

14. The dissent would hold that the trial court had no authority to order the School to graduate Than. In support of its argument, the dissent cites one case: *Amelunxen v. University of Puerto Rico,* 637 F.Supp. 426 (D. Puerto Rico 1986), *aff'd,* 815 F.2d 691 (1st Cir.1987). In *Amelunxen,* the district judge wrote that he "has no

authority to order the University [of Puerto Rico] to award plaintiff a Master's Degree in Chemistry." 637 F.Supp. at 429–30. We decline to apply this conclusion for two reasons. First, and most specific to this case, it is Texas law that controls the issue of whether a Texas trial court may order a Texas state university to award a student a degree. Doubtlessly, Texas authorities such as the Texas Education Code and *Foley v. Benedict* did not figure in the court's conclusion in *Amelunxen.* Second, we do not agree that *Ewing* and *Horowitz,* the cases cited by the judge as support for his conclusion, support it, even indirectly. That specific proposition, to us, does not follow from those cases.

HUTSON–DUNN, Justice, dissenting.

I dissent.

Than's complaint against the University of Texas Medical School at Houston, et al., is based entirely on his claim that the School did not provide him the appropriate constitutional due process that he should have had in the academic disciplinary proceedings brought against him by the School.

Than was in his third year when he sat for the NBME examination in surgery. The School assisted the NBME in giving the exam to the students by furnishing proctors for the exam. The School was to apply the NBME rules in administering the examination and in dealing with matters of cheating arising during the test.

The record demonstrates that this is exactly what the School attempted to do. After careful consultation, two proctors agreed that Than was cheating and sought instruction from Dr. McNeese, who was in charge of administering the NBME exam on behalf of the NBME and advising proctors in situations such as this. They were informed of all alternative actions (recommended by the National Board) that could be taken. However, during the time it took to determine the proper type of action to take, the problem alleviated itself. Chiang, the medical student whose paper Than was copying from, finished 30 minutes early, and because there was no one else sitting close to Than, the proctors had no cause to take any further action during the test. The proctors made full written reports of the incident to Dr. McNeese; one report was dated the day of the exam, February 22, 1991, and the other was dated February 25, 1991. There was no evidence indicating the time that these reports were received in Dr. McNeese's office. Dr. McNeese assumed it was sometime shortly following the dates of the reports.

Under point of error one, the appellants argue:

As a matter of law, the trial court erred in finding that Than was denied due process because there was no evidence to support the conclusion that Than was denied the due process required in an academic discipline context.

The trial court and the majority found that the School violated Than's right to due process for the following reasons:

a. lack of timely notice of the hearing

b. lack of notice of the evidence to be used against him

c. occurrences during the hearing

These claims are addressed separately below.

**NOTICE OF THE HEARING**

The record reflects the following evidence regarding whether the School gave Than notice of the charges in a manner timely by due process standards.

Than took the NBME exam on February 22, 1991. Dr. McNeese, the dean of students, received the proctors' reports no earlier than February 25. Dr. Kelley of the National Board was asked to do a statistical correlation to determine whether cheating occurred. Dr. McNeese testified that, at this juncture in the proceedings, she was unwilling to go forward with making any allegations against Than until she heard from the National Board.

On March 8, Dr. McNeese received a letter from the National Board, written by Dr. Kelley. As soon as she received this letter, she began to try and notify Than by telephone and by putting notices in his mailbox at school. Ultimately, Than was notified, and went to Dr. McNeese's office on March 12. At this time, Than was told that he was being accused of cheating and that he had the right to hire an attorney. There was at least one, and possibly two, other informal meetings with Dr. McNeese or her staff during which the case was discussed.

In a letter dated April 4, Than was formally charged with committing academic dishonesty during the NBME exam. At this point, Than began contacting other students who took the exam with him who could testify in his defense.

The majority notes that the School did not follow its own rules with regard to dealing with a student who is suspected of cheating. However, Dr. McNeese testified during the administrative hearing that the National Board rules, unlike the School's rules, do not state that a student should be notified during an examination that he is suspected of cheating. It was the *National Board* rules that applied during the exam. Dr. McNeese testified that the National Board requires that a statistical correlation be done to determine whether cheating occurred.

The majority does not claim that the length of time between the exam and the time that Than received notice was too long in the number of days per se. Instead, the majority claims that notice was untimely because after April 4 (41 days after the exam on February 22), Than could not prepare his case because of a loss of evidence, i.e., potential witnesses forgot seating details.

The students who took part in this exam were medical students and classmates of Than, and were still at the School after the exam. The names of these students were available to Than. The record indicates that Than actually did contact some of the students who sat for the examination with him. He was even able to find two students who were willing to testify on his behalf.

The assertion by the majority that students might not be able to remember seating details does not support the finding that Than could not properly prepare his case. The fact that some students could not remember where they were sitting has no bearing on whether they remember seeing Than cheat. The record indicates that any witness who might have seen Than cheating, even though they may have forgotten where they sat while the cheating occurred, would not have forgotten seeing the event itself. In fact, both students who testified for Than at the hearing stated that they recalled seeing academic dishonesty during other tests that had occurred over a year prior to the hearing.

I would hold that the evidence *does not support* the trial court's finding that the ap-

pellants' "lengthy delay in advising [Than] of the charges against him materially disadvantaged his ability to investigate and prepare his defense to the charge of academic dishonesty," and that "the university's failure to confront and explain the circumstances surrounding the suspicion of cheating to [Than] in a more timely manner substantially impacted [Than's] ability to meaningfully respond to the charge."

## NOTICE OF THE EVIDENCE TO BE USED AGAINST THAN

The majority finds that the School's notice to Than of the evidence to be used against him was constitutionally insufficient. It bases this finding on the facts that (1) Than had only five days to prepare for the hearing because he received the package with the copies of the documents to be used against him on April 12, five days before the hearing scheduled on April 18, and (2) Than received no notice that the following evidence would be used at the hearing: (a) a specific psychiatry grade; (b) Dr. Kelley's work product in regard to the comparison of Than and Chiang's exam papers; and (c) the statistical methodology explaining the analysis set forth in Dr. Kelley's letter.

### Five days notice

The majority first claims that Than did not have enough time to prepare for the hearing, as he received the evidence that would be used against him only five days before the hearing. The evidence shows, however, that *Than* wanted to have the hearing immediately. He encouraged Dr. McNeese to set the hearing as soon as possible and he never complained about the date of the hearing. Further, "[t]here is no constitutional requirement that, to provide [the students] an opportunity to respond, [Than] must have received any more in the way of notice than a statement of the charge against [him]." *Nash v. Auburn Univ.*, 812 F.2d 655, 663 (11th Cir.1987).

In *Nash*, two students who were accused of academic dishonesty were not notified of the specific charges against them and the witnesses to be heard until the day before

the hearing. 812 F.2d at 658. The court held that there was no constitutional violation because the students were present at the hearing, brought counsel and witnesses, and were able to present a defense and discredit adverse testimony. *Id.* at 662.

Than had more time than these students did, and had all of the same opportunities. Than appeared on April 18, made no complaint that he was unprepared, and proceeded to present his views. He presented his defense, cross-examined the witnesses, and discredited adverse testimony as the record demonstrates, though he chose not to have counsel. Than testified that he did not wish to retain counsel.

Considering all of the above, I would hold that Than's due process rights were not violated by the fact that he received notice of the evidence to be used against him only five days before the hearing.

*Psychiatry grade*

In my dissent in *University of Texas Medical School v. Than,* 834 S.W.2d 425, 434, 435 (Tex.App.—Houston [1st Dist.] 1992, no writ) (referred to as *"Than II"* in the majority opinion), I found that the majority's conclusion that Than did not receive notice that his academic record would be used against him was not reasonably supported by the evidence. Dr. McNeese specifically advised Than that she might testify about any aspect of his student record. *Id.* at 435. For the reasons set forth in my previous dissent, I would again hold that Than's due process rights were not violated.

*Statistical analysis*

I agree with the majority's conclusion that Than did not receive the enclosure, in Dr. Kelley's letter, regarding the statistical methodology and analysis that the School received. Dr. Kelley's letter to Dr. McNeese, which Than received, stated in relevant part:

It is my judgment that since the total group of examinees tested was only 29, it is not advisable to estimate the percentage of the 26 items for which that group would give the same wrong answer. Therefore, a probability that 23 agreements for 26 joint wrongs (88%) is a finding to be expected for examinees working independently can not be provided.

Robert Hill, Than's statistics expert, testified that Dr. Kelley's letter stated that the statistical analyses, which were explained in the methodology and analysis which Than did not receive, *were not applied by Dr. Kelley.* He based this conclusion on the information contained in Dr. Kelley's letter, which Than received. He stated that the portion of the letter quoted above means that the analysis could not be used because the sample size was too small, and, therefore, he could not calculate the necessary probabilities.

During the administrative hearing, Than testified in regard to the statistics referred to in Dr. Kelley's letter. He pointed out that the letter indicated that the study should not be relied on to prove how many students came up with the same number of wrong answers. Everything Than needed was in the letter from Dr. Kelley, which he received. Dr. Kelley did not apply the analyses which were explained in the addendum to his letter. Therefore, the analysis was of no use to Than.

I would find that Than's due process rights were not violated by the School's failure to give Than the statistical data and methodology which was enclosed in Dr. Kelley's letter, as he suffered no material prejudice. *See Keough v. Tate County Bd. of Educ.,* 748 F.2d 1077, 1083 (5th Cir.1984).

**THE HEARING**

*Visit to the exam room*

The majority finds that Than's due process rights were violated due to occurrences at the hearing. The majority first states that the hearing was tainted because Dr. Russell went into the examination room at the conclusion of the hearing and Than was not allowed to go with her.

The record demonstrates that Dr. Russell did not consider any evidence gleaned from

her trip to the exam room that she had not already heard during the hearing. Nor does Than point to any conclusion that she reached that she could not have reached if she had not gone into the room.

Dr. Russell did go into the exam room after the completion of the hearing, and sat in all four chairs. Others were there with her to sit in the chairs sat in by Chiang, Than, and the witnesses. Dr. McNeese told Dr. Russell where each person sat in the room, using the seating chart which had already been introduced into evidence. Dr. Russell testified that sitting in Than's seat, she could see an uncovered sheet on Chiang's desk. However, she learned no more by visiting the exam room than she learned from the testimony presented to her during the hearing; the exam proctors testified during the hearing that Than could see Chiang's paper from where he was sitting. What Dr. Russell saw in the room was simply cumulative of what had already been introduced into evidence at the hearing.

Further, due process in a disciplinary situation requires no more than an "informal give-and-take" between the student and the school. *Goss v. Lopez,* 419 U.S. 565, 584, 95 S.Ct. 729, 741, 42 L.Ed.2d 725 (1975); *Amelunxen v. University of Puerto Rico,* 637 F.Supp. 426, 431 (D. Puerto Rico 1986), *aff'd,* 815 F.2d 691 (1st Cir.1987). It is not necessary to have a formal hearing and apply formal rules of evidence to meet due process standards. *Goss,* 419 U.S. at 585, 95 S.Ct. at 741; *Amelunxen,* 637 F.Supp. at 431. In *Goss,* the Supreme Court wrote:

> To impose ... even truncated trial-type procedures might well overwhelm administrative facilities in many places and, by diverting resources, cost more than it would save in educational effectiveness. Moreover, further formalizing the [ ] process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process.

419 U.S. at 583, 95 S.Ct. at 740–41.

*Burden of proof*

The majority also expresses concern over the fact that Dr. Russell did not seem to understand the concept of burden of proof and its proper application. She thought both parties had a burden to prove their respective cases. I find this to be inconsequential. Courtroom standards, with attendant rules of evidence and burdens of proof, are not even required in a school setting. *Goss,* 419 U.S. at 585, 95 S.Ct. at 741; *Amelunxen,* 637 F.Supp. at 431. An informal give-and-take is all that is necessary. *Goss,* 419 U.S. at 585, 95 S.Ct. at 741; *Amelunxen,* 637 F.Supp. at 431.

Considering all of the foregoing, I would hold that Than received all the due process to which he was entitled.

I would sustain point of error one.

Under point of error two, the appellants argue:

> The trial court erred in its grant of the permanent injunction sought by Than because there is no evidence to support the conclusion that the procedural due process violations could not be cured, and thus at most, the remedy for procedural due process violations is an order requiring Than receive due process.

Under this point of error, the majority finds that the due process violations cannot be cured because it is too late to have a fair and reliable hearing and because the due process violation was not Than's fault. Due process requires an opportunity to be heard at a meaningful time and in a meaningful manner. *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). I do not agree that Than's due process rights were violated. Even if there was a violation of his rights, the School has a record of the students who were present at the NBME exam, and they can be contacted to testify in some fashion. Furthermore, the two proctors are available, as well as Than's academic records. As is demonstrated by the record, students tend to remember when they see someone cheat, so the fact that there has been a long period of time between the event and the hearing is irrelevant.

The majority insists on imposing courtroom principles and standards on a school

disciplinary hearing. Applying that idea here, I note that there are many cases that do not come to trial for several years after the actionable event occurs. Yet we do not simply wipe them from the docket because it's possible that some witnesses' memories might have faded.

The fact that Than has completed the balance of his necessary classes to complete the academic portion of his medical training does not change the fact that the School dismissed him for cheating, and was forced by means of a restraining order to allow him to continue his studies. Here, the integrity of the School is at stake. Cheating not only cuts across the struggle of our schools to achieve academic excellence, it underpins and supports intellectual mediocrity. *Even though I disagree that any of Than's due process rights were violated,* I see no reason why the School should not be afforded the opportunity to hold a second hearing if the majority is correct in its assertions.

I would sustain point of error two.

Under point of error three, the appellants argue:

> The trial court erred as a matter of law by ordering UT to grant Than a medical degree because such an order is beyond the proper authority of the court.

Under this point of error, the majority holds that the trial court was correct in ordering the School to issue Than a diploma. I would find that the trial court has no authority to order the School to graduate Than. There is no precedent for such an act. In a similar situation, a federal court held: "At the outset, the court clarifies that it has no authority to order the University to award plaintiff a Master's Degree ..." *Amelunxen,* 637 F.Supp. at 429–30 (citing *Regents of Univ. of Michigan v. Ewing,* 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985); *Board of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978)). There are many things a medical school considers when determining whether to graduate a student; academics is only one of them. *See Hankins v. Temple Univ. Health Sciences Center,* 829 F.2d 437, 439, 441 (3d Cir.1987).

I would sustain point of error three.

In conclusion, I would order that the permanent injunction be dissolved.