Barbara Joan AMELUNXEN, Plaintiff,

v.

UNIVERSITY OF PUERTO RICO, Prof.
Salvador Alemañy, Dr. Fred V. Soltero
Harrington, et al., Defendants.

No. Civ. 84–2199(HL).

United States District Court,
D. Puerto Rico.

April 22, 1986.

Victor E. Báez, Hato Rey, P.R., for plaintiff.

Angel L. Calero, Old San Juan, P.R., for defendants.

### OPINION AND ORDER

LAFFITTE, District Judge.

Plaintiff, Barbara Joan Amelunxen, filed this action against defendants, the University of Puerto Rico ("UPR"); Dr. Salvador Alemañy, Chancellor of the Mayaguez Campus of UPR; professors Dr. Flavio Padovani Padilla, Dr. Fred V. Soltero Har-

rington and Dr. Eneida B. de Rivero, the members of her master's Thesis Committee; Dr. Noemí Díaz, representative of the UPR Graduate School; and Attorney Rubén T. Nigaglioni, the hearing officer who presided over her administrative hearing. Plaintiff claims under 42 U.S.C. sections 1983, 1985 that her due process rights were violated when the Thesis Committee failed her oral thesis examination and the UPR Graduate School subsequently suspended her from the Master's Program. This court has jurisdiction of this action under 28 U.S.C. sect. 1331.

Defendants, UPR, the members of the Thesis Committee and the Mayaguez Campus Chancellor, and the Administrative Hearing Officer have presented separate motions to dismiss or, alternatively, motions for summary judgment. We treat the motion by the Thesis Committee members and Mayaguez Campus Chancellor as a motion for summary judgment. The motions by co-defendant, Attorney Nigaglioni, the Administrative Hearing Officer, and UPR are treated as motions to dismiss. The motions of all parties are GRANTED.

In August 1977, plaintiff, Barbara Joan Amelunxen enrolled in the UPR Graduate School, Mayaguez Campus, to pursue a Masters Degree in Chemistry. A Master's candidate at the Mayaguez Campus is required to take a fixed courseload and to research and write a thesis and present it before a committee of professors specializing in that field of study. To pass the thesis examination the graduate student must receive the unanimous approval of all members of the committee. A student who fails the oral thesis examination may retake the exam two more times at a later date in the semester or sometime the following semester. A classification of Non-Satisfactory ("NS") is given for each semester in which a student fails to pass the thesis examination. According to the "Rules that Regulate the Graduate Studies in the Mayaguez University Campus" ("Mayaguez Campus Graduate Studies Regulations"), a student who receives an "NS" classification for two consecutive semesters is automatically suspended from the Graduate School.

Ameluxen completed her required course work with a 3.75 average (4.0 point scale). She wrote a thesis entitled "Digestibility of the Leaf Protein Contents (LCP) and Pressed Fibrous Residues of Tropical Crops and the Determination of their Phenolic Contents." On May 7, 1982, she presented this thesis to the members of her Thesis Committee; co-defendants, Dr. Fred Soltero Harrington, Dr. Flavio Padovani Padilla, Dr. Jan García Rivera, and Dr. Noemí Díaz Santiago, the Graduate Studies representative. As part of the oral examination the Committee members questioned plaintiff on her thesis and her general knowledge of chemistry. The exam lasted approximately two and half hours.

Immediately following the examination, the Committee evaluated plaintiff's defense of her thesis and answers to basic chemistry. The Committee decided unanimously that plaintiff had not passed the exam. They stated in writing:

> The Committee unanimously considers that the scientific value of the thesis in its experimental design, as well as the conclusions derived from the study, lack the merit and critical analysis required in a thesis work for a masters in science.

Co-defendant, Jan García-Rivera, a member of the Thesis Committee, stated:

> During the course of "Amelunxen's" oral examination, the answers given to questions made by the "Thesis Committee" revealed that she lacked sufficient basic knowledge in the field of chemistry to be granted a Master's degree in chemistry. Furthermore, her explanations concerning the data sampling's control and management used as part of her thesis, demonstrated that she did not understand what is the scientific method known as replication (test's repetitions). A person who does not understand what is replication cannot be given a Master's degree in Chemistry, because replication is a very important and basic principle in the field of chemistry.

"Amelunxen" failed completely in both the logical explanation of her thesis, as well as in her lack of general knowledge of basic chemistry principles.

Co-defendant Flavio Padovani-Padilla, another committee member, stated:

[T]he answers given by "Amelunxen" to the questions made during her oral examination showed to me and to the "Thesis Committee" that to a great extent, the data sampling and critical analysis used in her thesis were not correct, which in turn, made many of the conclusions of the thesis to be also incorrect. That the answers and explanations given by "Amelunxen" to the questions of the "Thesis Committee", during the course of the oral examination, did not support the work contained in the thesis, and showed her lack of general knowledge of chemistry's basic principles.

[T]he evaluation of "Amelunxen" 's examination and defense of her thesis was made by me and by the other three (3) members of the "Thesis Committee" after an open and frank discussion among all of us of the poor quality of her answers to the questions made to her during the examination.

Amelunxen received an "NS" for the semester in which she failed her thesis examination. The following semester she received a second NS classification for her failure to improve the thesis or retake the oral examination. In accordance with the Mayaguez Campus Graduate Studies Regulations plaintiff was automatically suspended in January, 1983, after her second consecutive "NS" classification.

On February 1, 1983, Amelunxen requested the Mayaguez Graduate School Council to lift the administrative suspension and to grant her a Master's Degree in chemistry. The Council explained it had no authority to issue a student an academic degree, but it recommended that Ameluxen be readmitted and given a year extension to complete her Master's studies. Following this recommendation plaintiff paid the readmission fee to the UPR Graduate School.

Despite the Graduate School Council's recommendation, plaintiff was denied readmission by the Graduate Council for the Chemistry Department which reviews petitions for reenrollment. Plaintiff's failure to meet with the five member Chemistry Department Committee was cited as the reason for the denial. An attorney for plaintiff, Juan Jesús Ramírez Rivera, appealed plaintiff's suspension and denial of readmission to the Chancellor of the Mayaguez Campus, Dr. Salvador Alemañy. On August 9, 1983 the Chancellor sustained the Thesis Committee's evaluation of plaintiff's Thesis Examination and the University's decision to suspend her. Chancellor Alemañy testified in his affidavit that he based his decision to sustain plaintiff's suspension on the letter submitted by plaintiff's attorney and attached documents, including the Thesis Committee report on the results of Ameluxen's oral exam.

Plaintiff appealed the Chancellor's decision to the President of UPR, Dr. Ismael Almodóvar. The President granted Ameluxen the opportunity to present her complaint at an administrative hearing. Co-defendant, Attorney Rubén T. Nigaglioni, was appointed Hearing Officer by Chancellor Alemañy. A hearing was held on May 30, 1984. To date no decision has been rendered by the Hearing Officer.[1]

Plaintiff claims that the Thesis Committee's evaluation of her and her subsequent suspension was an arbitrary and capricious decision by the University and a violation of her due process rights. Plaintiff asks the court for an award of damages against the co-defendants jointly and severally, and for injunctive relief ordering UPR to issue her a Master's Degree in Chemistry.

■ At the outset, the court clarifies that it has no authority to order the Univer-

---

1. Plaintiff amended her complaint to include Attorney Nigaglioni as a defendant when she learned he was one of the attorneys for UPR, Mayaguez Campus, and that he represented two of the co-defendants, Chancellor Alemañy and Dr. Flavio Padovani Padilla, in an action in a Commonwealth court.

sity to award plaintiff a Master's Degree in Chemistry. *See Regents of the Univ. of Mich. v. Ewing,* —— U.S. ——, 106 S.Ct. 507, 88 L.Ed.2d 523, (1985); *Board of Curators, Univ. of Mo. v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). However, since the prayer for relief in a complaint is to be liberally construed, *see, generally,* F.R.C.P. 54(d), we proceed on the basis that the plaintiff seeks, as part of her request for injunctive relief, the opportunity to improve her thesis and retake the oral examination.

■ An additional preliminary matter is defendants' suggestion in the Pre-Trial Order that the Court lacks jurisdiction because plaintiff filed this action prior to a decision by the Hearing Officer and, therefore, failed to exhaust her administrative remedies. We find that jurisdiction over plaintiff's claim is proper. In *Patsy v. Board of Regents of State of Fla.,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), the Supreme Court held that exhaustion of state administrative remedies is *not* a prerequisite to bring a civil rights claim under 42 U.S.C. sect. 1983. There, the Court explained "[we have] stated categorically that exhaustion is not a prerequisite to an action under sect. 1983 and we have not deviated from that position in 19 years since *McNeese* [*v. Bo. of Ed.,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963) ]." 102 S.Ct. at 2560.

In support of their Motion for Summary Judgment the Mayaguez Campus Chancellor and each member of the Thesis Committee filed an affidavit. In response to their motion, plaintiff has filed her own affidavit and other documentary evidence. When evidence outside the pleadings is presented by the parties and considered by the court the motion is treated as one for summary judgment. *See* F.R.C.P. 12(c).

Summary judgment is proper only when it is shown on the pleadings and other evidence in the record "that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." F.R.C.P. 56(c). In determining whether summary judgment is appropriate the court must look at the record in a "light most favorable to ... the party opposing the motion ..." *Hahn v. Sargent,* 523 F.2d 461 (1st Cir.1975), quoting *Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). It is widely recognized that summary judgment is an extreme remedy and should not be granted unless it is clear beyond controversy that no dispute exists as to any fact which affects the outcome of the case and the moving party is entitled to judgment as a matter of law. Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 2d sect. 2712 (1984). Whenever there is ever the "slightest doubt as to the facts," summary judgment must be denied. *Morrissey v. Procter & Gamble Corp.,* 379 F.2d 675 (1st Cir. 1967), quoting *Peckham v. Ronrico Corp.,* 171 F.2d 653 (1st Cir. 1948).

Plaintiff claims under 42 U.S.C. sect. 1983 that her suspension was arbitrary and capricious and a violation of due process. In considering defendants' summary judgment motion this claim presents the court with several legal issues: 1) whether plaintiff has a property or liberty interest in remaining a graduate student at U.P.R. Mayaguez Campus, and 2) whether defendants violated either plaintiff's procedural or substantive due process right. *See Regents of Univ. of Mich. v. Ewing, supra; Bd. of Curators of Univ. of Mo. v. Horowitz, supra.* Defendants did not raise the first issue in their motion. They may assume, as the Supreme Court has done, and we will do, that a student has either a property or liberty interest in continuing education.[2]

■ This case presents no procedural due process issue. Plaintiff was afforded full procedural rights by the University. In fact, the U.P.R., Mayaguez Campus, went far beyond the constitutionally re-

---

2. The Supreme Court has yet to address directly the issue whether a student has a property or liberty interest in a continuing education. In both *Ewing, supra,* and *Horowitz, supra,* the Court assumed based on the particular facts of the case, that a liberty interest existed.

quired due process. Plaintiff was permitted to appeal her suspension to the Graduate School Council, the Chancellor of the Mayaguez Campus and the U.P.R. President, who granted her an administrative hearing. At each stage of appeal plaintiff's case was given due consideration.

The Supreme Court has drawn a distinction between the Fourteenth Amendment procedural due process requirements when a student is dismissed or suspended for disciplinary reasons and a suspension or dismissal for academic reasons. *Compare, Horowitz, supra; Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). In the Court's view a hearing may be helpful to ascertain a student's misconduct but is useless or harmful to find out the truth as to scholarship.

In *Goss,* the Court stated that a suspension of a student for disciplinary reasons has a sufficient resemblance to judicial or administrative factfinding to call for a "hearing" before the relevant school authorities. It concluded:

> [I]t would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story in order to make sure that an injustice is not done.
>
> . . . . .
>
> [R]equiring effective notice and informal hearing permitting the student to give his version of the events will provide a meaningful hedge against erroneous action. At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect.

*Id.* at U.S., at 580, 583–584, 95 S.Ct., at 739, 741.

■ The due process requiring in a disciplinary dismissal or suspension situation is no more than an "informal give-and-take" between the student and the administrative body taking the disciplinary action. *Goss*

stopped short of requiring a formal hearing since "further formalizing the suspension process and escalating its formality and adversary nature may not only make it too costly as a regular disciplinary tool but also destroy its effectiveness as part of the teaching process." *Id.,* at 583, 95 S.Ct., at 741.

*Horowitz* addressed the issue of due process requirements in the case of an academic suspension or dismissal. The Court expressed its position that to further enlarge judicial presence in the academic community would "risk the deterioration of many beneficial aspects of the faculty-student relationship." 435 U.S. at 90, 98 S.Ct. at 955. Unlike disciplinary actions, academic evaluations bear little resemblance to judicial or administrative fact-finding proceedings. Academic decisions are less based on fact and are more subjective and evaluative in nature. *Horowitz* held that an academic dismissal or suspension calls "for less stringent procedural requirements" than are called for in a disciplinary case. *Id.* 435 U.S. at 86, 98 S.Ct. at 953.

■ Since the procedural requirements in the case of an academic dismissal are so minimal, in only extremely rare situations would an educational institution's actions be found to violate the Fourteenth Amendment procedural due process right. If a school's decision is to be reversed it must be done on the basis of a substantive due process; that the decision was based on unconstitutional criteria or was "arbitrary and capricious." *Ewing, supra. See also, Horowitz, supra.*[3]

■ As defined by the Supreme Court in *Ewing,* the "arbitrary and capricious" standard is extremely rigid. If the decision of the school was not made in bad faith and the procedures applied were not unfair, the decision will stand unless it "is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."

**3.** In both *Ewing* and *Horowitz,* the Court assumed, without deciding, that federal courts can

review an academic decision of a public school under the substantive due process standard.

106 S.Ct. at 513. In the Court's view the role of the judiciary should not be to "trench on the prerogatives of state and local educational institutions" but to "safeguard their academic freedom." 106 S.Ct. at 514.

Viewing the evidence of this case in a light most favorable to the plaintiff, the non-movant, as we must on a motion for summary judgment, we find there to be no genuine issue as to any material fact and defendants are entitled to judgment as a matter of law.[4] Though plaintiff argues the Thesis Committee's decision to fail her oral exam and the Administration's decision to dismiss her from the graduate school were made in bad faith, no evidence exists to support this allegation. There is no indication that either the members of the Thesis Committee or the administration had a vendetta against plaintiff or that they made their decisions on the basis of anything other than the proper criteria.[5]

■ Plaintiff argues that the Thesis Committee evaluation is arbitrary and capricious because they did not take into consideration the fact that the collection and preparation of the samples used in the research and writing of plaintiff's thesis was not done by plaintiff but by an employee of the U.S. Agricultural Department. It is true that at least the two members of the Thesis Committee who wrote specific reasons for plaintiff's failure were critical of the samples and one member indicates that the sample inaccuracies might have lead to incorrect conclusions in plaintiff's thesis. However, the Committee was notified that plaintiff had not prepared the samples. Their evaluation of plaintiff's work and her knowledge of chemistry was based only in small part, if at all, on the problems with the samples. The Committee questioned plaintiff for two hours about her thesis and her general knowledge of chemistry. The decision of the Thesis Committee to fail plaintiff's oral examination was unanimous.

The Committee found that plaintiff's work "lacked the merit and critical analysis required in a thesis work for a masters in science." Member Padovani-Padilla's comment on plaintiff's performance was that "the answers and explanations given by 'Amelunxen' to the questions of the 'Thesis Committee,' during the course of the oral examination, did not support the work contained in the thesis, and showed her lack of general knowledge of chemistry's basic principles." García-Rivera, another member stated that plaintiff "lacked sufficient basic knowledge in the field of Chemistry to be granted" a Master's Degree.

Even if the Committee might be faulted for not giving greater consideration to the fact that plaintiff did not prepare the samples, their evaluation cannot be said to be such a substantial departure from accepted academic norms as to demonstrate that the faculty did not exercise professional judgment. In rendering their decision the committee evaluated plaintiff's thesis work as a whole, and her basic knowledge of chemistry. Their evaluation of plaintiff was not arbitrary and capricious.

■ Plaintiff also argues that the decision of the UPR Mayaguez Campus administration to dismiss her from the graduate school was arbitrary and capricious and in violation of her substantive due process rights. Reduced to its essence, plaintiff's argument is that the Thesis Committee and the UPR administration failed to follow the Mayaguez Campus Graduate Studies Regulations. The major deviations from the Regulations cited by plaintiff are: 1) that the Thesis Committee's failure to meet with her and make recommendations for corrections on her thesis violated paragraph F2b for the Regulations, and 2) that the review of her application for readmission by the Graduate Council of the Chemistry Department was not proper under paragraph G2.

4. No argument is made, and there is no evidence, that the University's decision was made on the basis of unconstitutional criteria.

5. *See, infra* pp. 432–433 for discussion of the procedures applied by the University to dismiss plaintiff.

The evidence fails to support a claim for violation of substantive due process on the grounds that the procedures which lead to plaintiff's dismissal were unfairly applied. Paragraph G2 of the Mayaguez Campus Graduate Studies Regulations states:

> The students that *voluntarily* discontinue their studies may apply for readmission thru the campus Registrar's Office during the dates shown in the Official Academic Calendar. The application must be evaluated by the Departmental Graduate Committee of the Department in which admission is requested and they will submit the corresponding recommendations to the Faculty's Dean for his decision.

Plaintiff argues that she did not "voluntarily" discontinue her studies so the Graduate Committee for the Chemistry Department did not have the right to review her application for readmission. Whether the Chemistry Committee's review of plaintiff's application was improper is a question of interpretation of the Regulation.

Paragraph F2b requires the Thesis Committee to:

> Make recommendations about corrections and other necessary changes in the thesis or project and ascertain, thru the Graduate Counselor and the Representative of the Graduate Studies division of the examining committee, that said, corrections and changes be made within the period of time determined by the Committee, which period can be extended only until the last day of classes of the semester immediately after the one in which the student takes the exam.

Plaintiff testified in her affidavit that despite her attempt to communicate with the members of her Thesis Committee, they never met with her to offer suggestions of improvement. Taking this statement as true, it would appear that the Thesis Committee did not comply with the Mayaguez Campus Graduate Studies Regulations. We do not, however, find this to be suffi-

cient evidence that the procedures leading to plaintiff's dismissal were sufficiently unfair to be considered arbitrary and capricious.[6]

Plaintiff has failed to state a claim for violation of either procedural or substantive due process against the members of the Thesis Committee or the Chancellor of U.P.R., Mayaguez Campus. Their motion for summary judgment is GRANTED.

 Co-defendant Nigaglioni's motion we treat as a motion to dismiss. Defendant Nigaglioni's only involvement in this case came when he was appointed Hearing Officer to preside over plaintiff's administrative hearing. To state a cause of action under section 1983 plaintiff must allege that: 1) he or she was deprived of a federal right, and 2) the person who deprived him or her of that right was acting under "color of law." *See Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The Supreme Court has stated that section 1983 is to be interpreted against a "background of tort liability." *Monroe v. Pape*, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). Similar to an action in tort, a section 1983 plaintiff must allege that the deprivation of a constitutional right by defendant caused an injury and that a causal connection exists between the injury and the deprivation. Since Nigaglioni has not yet rendered a decision, plaintiff has no claim, at this point, that he deprived her of due process or any other federal right, or that he cause her injury.

 Even if a claim could be made that Nigaglioni violated plaintiff's constitutional rights and caused her injury, plaintiff has failed to establish that he was acting under "color of law." A private person is not considered a "state actor" and, generally, may not be sued under section 1983. However, when the private individual is alleged to have engaged in a con-

---

**6.** This claim made by plaintiff is no more than an argument that the Thesis Committee and Mayaguez Campus administration failed to comply with their own Mayaguez Campus Graduate School Regulations and may also be barred by the Eleventh Amendment. *See Pennhurst State School & Hosp., et al. v. Terri-Lee Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

spiracy with government officials to deprive plaintiff of federal rights, he is considered to have acted "under color of law" and a sect. 1983 claim against him is proper. *Tower v. Clover*, 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1980); *Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). Nigaglioni is a private attorney who was appointed by UPR to preside over plaintiff's administrative hearing. Plaintiff alleges in her complaint that Attorney Nigaglioni represents the Mayaguez Campus of UPR, as well as two of the co-defendants, in another action and that the administrative hearing "was a sham and totally devoid of validity." We find these allegations insufficient to claim a conspiracy between Nigaglioni and UPR officials. *See Dennis v. Sparks, supra.*

The final co-defendant, UPR, has moved the court to dismiss them as a party defendant on the basis of an Eleventh Amendment immunity. Whether a state university or other state entity may be sued under section 1983 depends whether it is considered an "agency or instrumentality" of the state. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662. This inquiry is generally conducted on the basis of state law. *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The UPR is a tax-exempt institution which "achieves a public purpose of the Commonwealth of Puerto Rico." 18 L.P.R.A. § 612(F). UPR's budget is provided by the general revenues collected by the Government of Puerto Rico. 18 L.P.R.A. 221, 221a. The governing board of the University is composed of the Secretary of Education and eight other members who are all appointed by the Governor with advise and consent from the Senate of Puerto Rico. 18 L.P.R.A. 602(a), (b)(1). The First Circuit stated in *Perez v. Rodriguez*, 575 F.2d 21 (1st Cir.1978) that:

> The intent and nature of the Commonwealth of Puerto Rico's financial support for the University of Puerto Rico and the fact that the Commonwealth appoints the governing body of the University con-

vinces us that the University is sufficiently an "arm" of the state, ... to be immune from damage suits under the Eleventh Amendment.

We find that the Eleventh Amendment bars suit against the University for damages, and, as earlier held plaintiff has failed to state a claim for violation of a constitutional or federal right upon which this Court could grant injunctive relief.

The Motion for Summary Judgment by defendants, members of the Thesis Committee and the UPR Chancellor, is GRANTED. The Motions to Dismiss by Attorney Nigaglioni and the University of Puerto Rico are GRANTED. The Clerk shall enter judgment dismissing the complaint.

IT IS SO ORDERED.