Gary PACELLA, Plaintiff,

v.

**TUFTS UNIVERSITY SCHOOL OF DENTAL MEDICINE, Defendant.**

**No. CIV. A. 98–11417–WGY.**

United States District Court, D. Massachusetts.

Sept. 24, 1999.

Matthew Cobb, Law Firm of Matthew Cobb, Boston, MA, for Gary Pacella, Plaintiff.

Diane Rosse, Nutter, McClennen & Fish, Nancy A. McGuire, Nutter, McClennen & Fish, LLP, Boston, MA, for Tufts University School of Dental Medicine, Defendants.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

I. *Introduction*

The defendant, Tufts University School of Dental Medicine ("Tufts"), has filed a motion for summary judgment with respect to the claims of a former student, Gary Pacella ("Pacella").

After Tufts dismissed him in 1997 purportedly for failing to perform at an acceptable academic level, Pacella sued Tufts for (i) violations of the Americans With Disabilities Act (the "Disabilities Act"), 42 U.S.C. §§ 12101, et seq., and violations of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. §§ 794, et seq., alleging that he was discriminated against on the basis of a visual disability; (ii) breach of contract for Tufts' alleged failure to abide by certain dismissal procedures embodied in the Student Handbook; and (iii) violations of the Massachusetts Equal Rights Act, Mass. Gen. Laws ch. 93, § 103 (the "Equal Rights Act") on the basis that Tufts' alleged discrimination denied Pacella the equal protection of laws.[1]

## II. *Summary Judgment Standard*

Summary judgment is appropriate if, after reviewing the facts in the light most favorable to the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine" issue is one that "properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A "material" fact is one that "might affect the outcome of the suit" under the applicable legal standard. *Id.* at 248, 106 S.Ct. 2505.

The burden is on the moving party to show the absence of a genuine issue of material fact. *See Finn v. Consolidated Rail Corp.,* 782 F.2d 13, 15 (1st Cir.1986).

If the movant sustains his or her burden, the nonmovant can only survive summary judgment if he or she proffers evidence supporting the existence of a genuine issue of material fact to be resolved at trial. *See Donovan v. Agnew,* 712 F.2d 1509, 1516 (1st Cir.1983).

## III. *Violations of the Disabilities and Rehabilitation Acts*

In Counts I and II of the complaint, Pacella avers that Tufts failed reasonably to accommodate his visual disability, amblyopia of the left eye and severe myopia of the right eye,[2] and consequently seeks remedies under the Disabilities Act and the Rehabilitation Act (collectively, the "Acts"). Title III of the Disabilities Act, 42 U.S.C. § 12182, provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation ...." Similarly, the Rehabilitation Act, 29 U.S.C. § 794(a), states that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." Both statutes apply to discrimination by educational facilities in receipt of federal funds such as Tufts. *See* 42 U.S.C. § 12181(7)(J) and 29 U.S.C. § 794(b)(2)(A).

By its motion, Tufts seeks summary judgment on two grounds. First, Tufts argues that under a very recent duo of Supreme Court decisions, Pacella is not "disabled" and thus cannot seek remedies

---

1. Pacella's complaint also included (i) a claim for violations of Mass. Gen. Laws ch. 151C that was *dismissed* at a previous motion session and (ii) a claim for violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11 H, I, that he voluntarily withdrew.

2. Amblyopia is "a loss of visual acuity, although the affected eye appears to be normal." *WebMD Medical Encyclopedia* <http://my.webmd.com/encyclopedia> (visited September 17, 1999). Myopia is "the medical term for nearsightedness, a visual defect in which distant objects cannot be seen clearly." *Id.*

under the Acts. Second, even if Pacella's visual impairment is a "disability," the record facts establish that "the accommodations which Pacella claims he sought were either provided or, by his own admission and that of his ophthalmologist, would not have affected his performance." Def. Mem. at 1.

### A. Relevant Facts Concerning Pacella's Alleged Disability

It is undisputed that as of June 6, 1995 Pacella had "amblyopia of his left eye due to severe high myopia and ha[d] only 20/200 best correction in his left eye due to this amblyopia." McGuire Aff., Ex. 5.[3] This condition left him "essentially monocular with his right eye." Id. Pacella's right eye also had a "significant myopia . . . ." Id.

According to his ophthalmologist, Pacella owned diopter glasses and contact lenses that he used in an attempt to correct his vision. Id. By wearing his diopter glasses, Pacella improved the vision in his right eye to "20/20 correctable vision." Id. At the same time, however, the myopia caused images to be "minified by approximately 25 percent," id., and he would have "some reduction of contrast vision," id., Ex. 6 at 67. This minification "combined with his monocular status . . . reduce[d] his depth perception and stereo tactic function under any task of reduced illumination." Id., Ex. 5.

By all reports, Pacella was able best to improve his vision by wearing his soft contact lenses. See id., Ex. 3. In so doing, Pacella reduced his minification problem to within three to four percent distortion. See id., Ex. 6 at 73. Due to an astigma-

tism, however, his right eye vision with contacts was only 20/25 "which would give him some difficulty with very fine detail" under reduced illumination.[4] Id., Ex. 5. Overall, by using his contact lenses, he was "able to function like a normal person [except it was] a little bit harder for him [to read] really fine print." Id., Ex. 6 at 81. To improve matters, Pacella also obtained a prescription for occupational bifocals which, by his own admission, addressed his need to be able to discern detail. See id., Ex. 1 at 71.

Apparently, the only significant visual problem Pacella has been unable to correct with any physical optical aide is his lack of stereopsis, i.e., depth perception, caused by his monocular vision. See Pl. Opp. Mem., Ex. 3 at 2. Pacella admits, however, that he "systematically" used "visual cues," namely association, shading, and touching, to "help [him] compensate for [his] deficit in depth perception." Id., Ex. 1, at ¶ 10. Moreover, although Pacella's lack of depth perception slowed down "significantly" the amount of time it took him to perform "assignments where relief delineation was obviously required," by comparison, his non-sight impaired classmates performed the same tasks only "somewhat" faster. Id. at ¶¶ 12, 14, 15

### B. Defining "Disability"

█ In any claim of discrimination brought under the Disabilities Act or the Rehabilitation Act, a plaintiff must first establish that he has a "disability." See Tardie v. Rehabilitation Hosp. of Rhode Island, 168 F.3d 538, 541–42 (1st Cir.1999). Under both acts, a disability is defined as "a physical or mental impairment that sub-

---

**3.** An ophthalmologist who examined Pacella on April 30, 1999 states that Pacella has 20/400 best correction in his left eye. See Pl. Opp. Mem, Ex. 3 at 2. Another ophthalmologist states that Pacella has 20/100 best corrected vision in his left eye. See id., Ex. 1 at ¶ 6. This variation does not, however, create a genuine issue of material fact because the Court's entire analysis assumes that Pacella is essentially monocular in his right eye.

**4.** According to the recent April 30, 1999 examination, Pacella has 20/30+3 best correct-

ed vision in his right eye. See Pl. Opp. Mem., Ex. 3 at 2. This means that Pacella must be as close as 20 feet to see what a person with normal vision can see at 30 feet. Even if the Court assumes that Pacella's eyesight was 20/30+3 at the time of the alleged discrimination, it does not change the conclusion of this memorandum, i.e., that Pacella's eyesight did not substantially limit the major life activities of seeing or learning.

stantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A); 29 U.S.C. § 705(20)(B)(i).[5] In two recent cases decided on the same day, the Supreme Court significantly limited what types of disabilities qualify for protection under the Acts. First, in *Sutton v. United Air Lines, Inc.*, — U.S. —, —, 119 S.Ct. 2139, 2148, 144 L.Ed.2d 450 (1999), the Supreme Court held that "those whose impairments are largely corrected by medication or other devices are not 'disabled' within the meaning of the [Acts]." Second, in *Albertsons, Inc. v. Kirkingburg*, — U.S. —, —, 119 S.Ct. 2162, 2169, 144 L.Ed.2d 518 (1999), the Supreme Court concluded that courts should consider corrective measures to include "measures undertaken with artificial aids, like medications and devices, and measures undertaken, whether consciously or not, with the body's own systems." Moreover, the *Albertsons* Court held that a "substantially limiting" disability is more than just a condition that makes one "different" from others. *See id.* at 2168. Rather, the inability to enjoy a major life activity must be "considerable" or "snificantly restricted." *Sutton*, — U.S. at — – —, 119 S.Ct. at 2150–51. As Chief Magistrate Judge Collings has noted, *Sutton* and *Albertsons* tacitly overruled *Arnold v. United Parcel Service, Inc.*, 136 F.3d 854, 863 (1st Cir.1998), wherein the First Circuit held that disabilities should be determined without reference to mitigating measures. *See Hurley v. Modern Continental Construction Co., Inc.*, 54 F.Supp.2d 85, 95 n. 11 (D.Mass. 1999).

### C. *Applying Sutton and Albertsons to Pacella's Condition*

In light of *Sutton* and *Albertsons*, Pacella cannot claim a disability with re-spect to his eyesight because, as corrected, it does not substantially limit a major life activity. In this case, the most relevant examples of major life activities expressly mentioned under the Acts are "seeing" and "learning." *See* 34 C.F.R. § 104.3(j)(2)(ii); 29 C.F.R. 1630.2(i). With respect to "seeing," by employing corrective measures, i.e., his contact lenses and occupational bifocals, Pacella had 20/25 (or 20/30 + 3) vision with only slight image minification. Although he was monocular with his right eye, his contact lenses allowed him to function "like a normal person [except it was] a little bit harder for him [to read] really fine print." McGuire Aff., Ex. 6 at 81. It stretches the imagination to say that a slightly reduced ability to read "really" fine print constitutes a "considerably limited" or "significantly restricted" ability to see. Furthermore, there is no evidence that Pacella's lack of depth perception substantially limited his major life activity of seeing; it only limited his ability to perform assignments requiring relief delineation and Pacella compensated for such inadequacy with visual cues.[6] While Pacella's corrected vision may vary from that of the general population, such differences do not constitute a substantially limiting disability. *See Albertsons*, — U.S. at —, 119 S.Ct. at 2168.

With respect to Pacella's major life activity of "learning," Pacella states that, even with his corrected eyesight, he (i) had "some" problems using "academic instructional devices such as a blackboard, and an overhead projector," Pl. Opp. Mem., Ex. 1, at ¶ 19; (ii) was disabled from "normally" using coded answer sheets, *id.* at ¶ 13; and (iii) was "some-

---

**5.** As noted by Judge Gorton in *Cormier v. Littlefield*, 13 F.Supp.2d 127, 129 (D.Mass. 1998), "[t]he standards under the ADA [and] the Rehabilitation Act ... are substantially similar and [can], therefore, be treated together for purposes of the pending motion." *See also Tardie*, 168 F.3d at 542 (" 'Disability' is defined identically under the ADA and the Rehabilitation Act.").

**6.** As a "measure undertaken ... within the body's own systems," the use of visual cues is a corrective device under *Albertsons. See Albertsons*, — U.S. at —, 119 S.Ct. at 2169.

what" slower than his classmates performing assignments requiring relief delineation, *id.* at ¶¶ 12,15.[7] Although these types of problems may limit the general process of learning in many academic disciplines, Pacella does not demonstrate that they *substantially* limited learning in his case. Even if Pacella's impediments substantially limited his ability to attend dental school, "[a]n impairment that interferes with an individual's ability to perform a particular function, but does not significantly decrease that individual's ability to obtain a satisfactory education otherwise, does not substantially limit the major life activity of learning." *Knapp v. Northwestern Univ.,* 101 F.3d 473, 481 (7th Cir.1996) (holding that heart condition preventing plaintiff from playing intercollegiate basketball but not otherwise interfering with college education did not substantially limit a major life activity under the Rehabilitation Act). Moreover, the "inability to pursue one career, such as [dentistry], does not constitute a severe impact on an individual's life." *McGuinness v. Univ. of New Mexico Sch. of Med.,* 170 F.3d 974, 979 (10th Cir.1998) (holding that medical student, who had anxiety disorder that manifested itself when he took chemistry and math tests, was not disabled because student failed to demonstrate that condition impeded performance in wide variety of disciplines). According to school transcripts, during the period of alleged discrimination, Pacella actually passed 30 of 37 courses. *See* Fleming Aff., Ex. 2. Pacella is demonstrably an intelligent individual and he has not shown that his eyesight substantially limits his capacity to pursue graduate degrees and careers other than dentistry. The Acts do "not guarantee an individual the exact educational experience that he may desire, just a fair one." *Knapp,* 101 F.3d at 482.[8]

Since Pacella's eye condition, as corrected, did not substantially limit the major life activity of seeing or learning, he cannot claim to be disabled as defined by the Acts.[9] This Court thus GRANTS Tufts motion for summary judgment with respect to Pacella's claims of discrimination under Counts I and II of the complaint and need not consider whether Tufts provided Pacella with reasonable accommodation.

7. To give Pacella every possible advantage, the Court considers his opinions as admissible even though, as is most likely the case, Pacella "is not qualified to render any medical opinion and he cannot draw any conclusions about the effect of his visual condition on his ability to perform course requirements at Tufts Dental School." Def. Reply Mem. at 5–6.

8. *Cf. Darian v. Univ. of Massachusetts Boston,* 980 F.Supp. 77, 87 (D.Mass.1997) (Gertner, J.) (holding that nursing student was disabled because complications of pregnancy "substantially interfere[d] with her ability to fully participate in an education program," not just a nursing program).

9. In his opposition brief, Pacella asserts (but does not develop) the argument that he has a disability because he (a) has a record of a disability, or (b) was regarded by Tufts as having a disability. *See* Pl. Opp. Mem. at 3. Although both assertions are alternative ways to prove a disability under the Acts, neither carries the day in this case. First, since Pacella's eyesight is not a "disability" under the Act, the mere fact that he has a history or record of such a condition adds no grist to the mill. *See Santiago Clemente v. Executive Airlines,* 7 F.Supp.2d 114, 118 (D.P.R.1998) (rejecting plaintiff's claim that she had a record of a hearing disability where she failed to establish that her poor hearing substantially limited major life activity). Second, in order to establish that one is regarded as having a disability, "it is necessary that a covered entity entertain *misperceptions* about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton,* —— U.S. at ——, 119 S.Ct. at 2150 (emphasis added). The evidence that Pacella relies upon, *see* Pl. Opp. Mem. at 3, however, fails to reveal that Tufts in any way entertained negative misconceptions about Pacella's eyesight. Although there is an unreferenced statement by the Tufts Assistant Dean of Admissions and Student Affairs that he did not "believe for a second that [Pacella] can make it academically (nor do the deans) . . .," Pl. Opp. Mem., Ex. 5, there is no indication that this statement referred to problems caused by Pacella's perceived eyesight problems.

### D. *Retaliation Claim Under Disability Act*

As a basis for his claim under the Disability Act, Pacella's complaint states that he was "subjected to various forms of retaliation and/or reprisal, and was subjected to reprisal and/or retaliation under [the Disabilities Act], by Tufts because of [his] repeated and continuous requests for accommodation, and because of [his] complaints to Tufts of non-accommodation." Compl. ¶ 79. Pacella appropriately asserts such a claim even though this Court holds that Pacella is not disabled. *See Soileau v. Guilford of Maine, Inc.,* 105 F.3d 12, 16 (1st Cir.1997). Tufts instant motion fails to seek summary judgment with respect to Pacella's claim of retaliation and thus, at least for the time being, that aspect of Pacella's Disabilities Act claim survives.

### IV. *Breach of Contract*

In Count IV of his complaint, Pacella asserts a claim against Tufts for breach of contract. In support of his claim, Pacella contends that (i) there was a contract between Tufts and Pacella, (ii) provisions of the Tufts Student Handbook (the "Handbook") constituted material covenants of the contract, (iii) the Handbook specifically stated that failing grades during the first year would not be cumulative as against Tufts' "four-failure" threshold for dismissal, and (iv) Tufts breached the contract by considering Pacella's first year failing grades. *See* Compl. ¶¶ 90–93. In its motion for summary judgment, Tufts first argues that a student handbook cannot provide the terms of a contract between student and university and Tufts' conduct should instead be considered under—and indeed in satisfaction of—a standard of "reasonable expectation." In the alternative, if the Handbook provided express covenants, Tufts argues that Pacella relies on non-existent provisions and fails to consider language that gave Tufts broad disciplinary discretion.

### A. *Student Handbook As Terms of Contract*

Whether a student handbook can supply the terms of the contract between a university and its students is unclear under Massachusetts law. Certainly, a contract between school and pupil can *expressly* incorporate the terms of a student handbook. *See Curry v. Lasell Seminary Co.,* 168 Mass. 7, 8, 46 N.E. 110 (1897) (holding that parent breached school contract by removing daughter on a Sunday in violation of school catalogue rules incorporated by contract). Similarly, to demonstrate that the expulsion of a student is neither arbitrary nor capricious, a school can point to his or her violation of rules set out in a student handbook. *See Coveney v. President & Trustees of the College of the Holy Cross,* 388 Mass. 16, 19–20, 445 N.E.2d 136 (1983). Students who allege breach of contract where a school has acted in violation of terms set forth in a handbook, however, have met with mixed success.

In *Cloud v. Trustees of Boston Univ.,* 720 F.2d 721, 724 (1st Cir.1983), the First Circuit examined a law student's claim that his expulsion hearing should have been governed by the law school's disciplinary rules rather than the student code of the general university. Noting that "little Massachusetts caselaw [describes] the principles to be applied in ascertaining the terms of the contract established between a university and its students," the First Circuit held that a provision in the law school's disciplinary rules subjected the student to the general student code. *Id.* Unfortunately, this Court cannot simply follow *Cloud* as the Massachusetts courts have obfuscated the issue in the sixteen intervening years.

From 1993 to 1995, three justices of the Massachusetts Superior Court have considered the student handbook-as-contract issue. First, in *Buckholz v. Massachusetts Inst. of Technology,* No. 852720, 1993 WL 818618, at *3 (Mass.Super. July 6, 1993), Justice Lopez held that "[w]here a univer-

sity specifies disciplinary procedures . . ., a student may have a contractual right to whatever procedural protections are described in a university's student handbook or disciplinary procedures manual." Then, in *Showell v. Trustees of Boston Univ.*, No. 935815, 1994 WL 879638, at *2–3 (Mass.Super. June 30, 1994), Justice Doerfer held that the academic requirements and promotional guidelines set out in the school catalogue could constitute contract terms between the student and the school. Finally, in *Anderson v. Massachusetts Inst. of Technology*, No. 940348, 1995 WL 813188, at *5 (Mass.Super.Jan.31, 1995), Justice Volterra implied that a student has a right to require schools to comply with disciplinary procedures described in student handbooks.[10]

The more generally applicable rule, however, is found in *Jackson v. Action for Boston Community Dev., Inc.*, 403 Mass. 8, 14–15, 525 N.E.2d 411 (1988), where the Supreme Judicial Court held that the implied contract between an employer and employee did not include the terms of a personnel manual given to an employee after his hiring, since (i) the employer "retained the right to modify unilaterally the personnel manual's terms [which] tends to show that any 'offer' made by the defendant in distributing the manual was illusory," (ii) nothing in the circumstances revealed "any negotiation over the terms of the personnel manual," (iii) "no special attention was called to the manual by the defendant," and (iv) "there is no indication that the plaintiff signed the manual, or in any way manifested his assent to it or acknowledged that he understood its terms." So here. In addition to a lack of any negotiation or assent, Tufts retained the unilateral right to make changes to the Handbook without notice, *see* Fleming Aff., Ex. 1 at 1, and did not call special attention to the Handbook in any of the relevant correspondence.[11] This Court adheres to the teachings of *Jackson* and holds that the terms of the Handbook were not contractually binding on Tufts.

B. *Standard to Apply in Absence of Express Terms*

■ As the provisions of the Handbook are not express terms of a contract between Tufts and Pacella, Tufts need only show that its dismissal of Pacella was neither arbitrary nor capricious. *See Coveney*, 388 Mass. at 19, 445 N.E.2d 136.[12] Although a decision under such a standard is usually within the province of the jury, this Court is mindful of the appropriate deference afforded universities in the "unique context of academic curricular de-

---

**10.** *See also Essigmann v. Western New England College*, 11 Mass.App.Ct. 1013, 1014, 419 N.E.2d 1047 (1981) (stating, in dicta, that provisions in school catalogue and semester grade reports may be implied terms of school-student contract).

Most recently, in *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 317 (D.Mass.1997), Judge Saris considered whether Boston University breached its contract with learning disabled students by refusing to provide course substitutions in math and foreign language that were promised in "various brochures, catalogues, and promotional materials." Citing language from *Russell v. Salve Regina College*, 890 F.2d 484, 488 (1st Cir. 1989), the court held that "[b]rochures, policy manuals, and other advertisements can form the basis of . . . contractual agreements" between universities and students. *Guckenberger*, 957 F.Supp. at 317. Unfortunately, the *Guckenberger* holding sheds but little light on the uncertain state of the law in Massachusetts as *Russell* dealt with Rhode Island, not Massachusetts, law. *See Russell*, 890 F.2d at 485.

**11.** Two letters directed to Pacella by members of the Student Promotions Committee did obliquely mention "the School's guidelines regarding failures . . . ." Gonthier Aff., Exs. 4, 9.

**12.** Tufts argues that the appropriate standard to apply is one of "reasonable expectation— what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." Def. Mem. at 14. Although the "reasonable expectation" standard is grounded in decisions of the First Circuit, the "arbitrary and capricious" standard chosen by this Court derives directly from decisions of the Supreme Judicial Court. *See, e.g., Coveney*, 388 Mass. at 19, 445 N.E.2d 136.

cision-making . . . ." *See Guckenberger*, 8 F.Supp.2d at 89. For example, in *Coveney*, the Supreme Judicial Court affirmed summary judgment in favor of a school, holding that "[v]iolations of reasonable rules and regulations of a school are a recognized ground for dismissal of a student." *Coveney*, 388 Mass. at 19, 445 N.E.2d 136; *see also Cloud*, 720 F.2d at 724–26 (affirming grant of summary judgment as to whether expelling student for violating rules was reasonable); *cf. Amelunxen v. University of Puerto Rico*, 637 F.Supp. 426, 431–432 (D.P.R.1986) (appropriate to grant summary judgment where no evidence presented that university acted in bad faith). In this case, Tufts presents substantial evidence that Pacella was expelled for his four years of poor academic performance. *See, e.g.,* Fleming Aff., Ex. 2; Gonthier Aff. ¶¶ 12–37. Pacella does not, however, point the Court to any admissible evidence of bad faith or improper motive. Consequently, as there is no showing that Pacella's dismissal was arbitrary or capricious, this Court GRANTS Tufts' motion for summary judgment with respect to Count IV of the complaint.

## V. *Violations of Equal Rights Act*

In Count V of his complaint, Pacella claims that Tufts interfered with or denied him equal protection of laws under the Equal Rights Act as well as under the Fourteenth Amendment of the United States Constitution and seeks remedies under the Equal Rights Act, Mass. Gen. Laws ch. 93, § 103. Title XV of the Equal Rights Act states that "[a]ny person within the commonwealth, regardless of handicap or age as defined in chapter [151B], shall, with reasonable accommodation have the same rights as other persons . . ., including, but not limited to, the rights secured under Article CXIV of the Amendments of the Constitution." *Id.* at § 103(a). While Pacella alleges that his visual disability is a "handicap," Tufts contrariwise seeks summary judgment on the ground that any alleged discrimination was not the result of "state action," and thus is not actionable under the Equal Rights Act.

■ Although Tufts is likely correct that there is no "state action" in the instant case,[13] this Court need not reach the issue because, as already held, Pacella is not handicapped. For the purposes of the Equal Rights Act, Chapter 151B defines a "handicap" as "a physical or mental impairment which substantially limits one or more major life activities of a person . . . ." Mass. Gen. Laws ch. 151B, § 1(17). This is the exact definition used to define "disability" under both the Disabilities Act and Rehabilitation Act. Since the Massachusetts Supreme Judicial Court looks to federal interpretations of the Disabilities Act and the Rehabilitation Act for guidance under Chapter 151B, *see Cox v. New England Tel. & Tel. Co.*, 414 Mass. 375, 384, 607 N.E.2d 1035 (1993) ("Because of the similarity between the [Acts and Chapter 151B], the Federal cases are most helpful in the resolution of cases involving [Chapter] 151B . . . ."); *Hallgren v. Integrated Fin. Corp.*, 42 Mass.App.Ct. 686, 687–89, 679 N.E.2d 259 (holding that when determining meaning of "handicap" under Chapter 151B, there is no "reason to deviate from the construction given to the similar Federal statutes."), this Court applies the teachings of *Sutton* and *Albertsons* and holds that a "handicap" under the Equal Rights Act must be determined in light of corrective measures employed by

---

13. In order for Tufts' activities to be considered "state action," Pacella would have to show that government actors were actually involved or Tufts was performing a traditional and exclusive state function. *See Phillips v. Youth Dev. Program, Inc.*, 390 Mass. 652, 656, 459 N.E.2d 453 (1983). As Tufts is a private university, and post-secondary school education is not necessarily a traditional state function in Massachusetts, *see* Mass. Const. Pt. 2, C. 5, § 2; *see generally Rendell–Baker v. Kohn*, 457 U.S. 830, 842–43, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), Pacella would have difficulty proving state action. *Cf. Phillips*, 390 Mass. at 655, 459 N.E.2d 453 (fact that youth development program was totally funded by state did not affect state action analysis).

the plaintiff. Consequently, since Pacella is not "disabled," *a fortiori* he is not "handicapped." Thus, this Court GRANTS summary judgment with respect to Pacella's claim under the Equal Rights Act.

## VI. *Conclusion*

For the reasons discussed above, this Court GRANTS Tufts' motion for summary judgment with respect to Counts II and IV. As for Count I, this Court GRANTS Tufts' motion with respect to claims of discrimination under the Disabilities Act but notes that Pacella's claim for retaliation under the Act presently survives. [Docket No. 17].

SO ORDERED.